**JOHNSON & JOHNSON, Plaintiff,**

v.

**COOPERVISION, INC. and the Cooper Companies, Inc., Defendants.**

**Civ. A. No. 88–715–JLL.**

United States District Court,
D. Delaware.

Aug. 17, 1989.

William Prickett and Elizabeth M. McGeever of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., and J. Nelson Happy and Richard Savage of Patterson, Belknap, Webb & Tyler, New York City, of counsel, for plaintiff.

Henry N. Herndon, Jr. of Morris, James, Hitchens & Williams, Wilmington, Del., and Edward V. Anderson, Patricia H. McCall and Barbara R. Shufro of Pillsbury, Madison & Sutro, San Jose, Cal., of counsel, for defendants.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

### I. INTRODUCTION

Plaintiff Johnson & Johnson brought this diversity action against defendants CooperVision, Inc. and The Cooper Companies, Inc., alleging fraud and breach of contract. (*See* Docket Item ["D.I."] 1.) The dispute arises out of a Purchase Agreement executed on December 31, 1986. (*See* D.I. 8, Ex. A; D.I. 12, Ex. A.) Under the terms of the Purchase Agreement, Johnson & Johnson (as purchaser) acquired the ophthalmic pharmaceutical business of CooperVision, Inc. and CooperVision Pharmaceuticals, Inc. (sellers).

Plaintiff alleges that defendant The Cooper Companies, Inc., is the corporate successor of CooperVision, Inc. and CooperVision Pharmaceuticals, Inc. (D.I. 1 at ¶ 2; D.I. 12 at ¶ 2.) Throughout this Opinion the various Cooper entities—namely, CooperVision, Inc., CooperVision Pharmaceuticals, Inc., and The Cooper Companies, Inc. —shall be referred to collectively as "Cooper." All three of the Cooper entities are (or were) Delaware corporations. (D.I. 1 at ¶ 2; D.I. 8, Ex. A at 1.) Johnson & Johnson is a New Jersey corporation. (D.I. 1 at ¶ 1; D.I. 8, Ex. A at 1.)

Presently before the Court are certain motions filed by Cooper. (*See* D.I. 4.) First, Cooper moves to dismiss this action pursuant to Rule 12(b)(7), Fed.R.Civ.P., because of Plaintiff's failure to join Iolab, Inc. ("Iolab"), a Johnson & Johnson subsidiary which Cooper maintains is an indispensable party under Rule 19(b). Similarly, Cooper requests dismissal claiming that this action was not brought in the name of the real party in interest: Iolab. *See* Rule 17(a), Fed.R.Civ.P. Finally Cooper moves, in the alternative, that this case be transferred to the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1404(a).

For the reasons set forth in this Opinion, the Court concludes that Iolab is an indispensable party within the meaning of Rule 19(b). This action cannot, "in equity and good conscience," proceed in Iolab's absence. Iolab is a Delaware corporation (D.I. 11 at 5; D.I. 12 at ¶ 8; D.I. 12, Ex. D at 1), the joinder of which would destroy the Court's subject matter jurisdiction, which is based solely upon diversity of citizenship. (*See* D.I. 1 at ¶ 3; 28 U.S.C. § 1332(a)(1).) Accordingly, Cooper's motion to dismiss for failure to join an indispensable party will be granted. The Court

need not and does not reach Cooper's alternative arguments.

## II.  BACKGROUND FACTS

As stated previously, this dispute grew out of the sale of Cooper's pharmaceutical business to Johnson & Johnson. Among the assets conveyed by Cooper as part of the pharmaceutical business were its trade accounts receivable. (D.I. 8, Ex. A, § 2(b)(ix) at p. 9.) The gist of Johnson & Johnson's Complaint is that Cooper, in the year preceding its sale of the business, entered into numerous promotional sales deals pursuant to which customers were sold large quantities of pharmaceutical products on generous price and refund terms outside of the ordinary course of business. (D.I. 1 at ¶¶ 10–12; D.I. 11 at 4.) Johnson & Johnson alleges that Cooper intentionally concealed the existence of these promotional deals. (D.I. 1 at ¶¶ 23–27; D.I. 11 at 4.) According to Johnson & Johnson, Cooper's alleged concealment was both fraudulent[1] and in breach of the terms of the Purchase Agreement.[2]

Moreover, Johnson & Johnson avers that Cooper failed to account properly for the promotional sales deals, thereby breaching the Purchase Agreement.[3] (D.I. 1 at ¶¶ 6–8, 10–19, 30–32; D.I. 11 at 4–5.) Such failure caused Cooper's 1986 financial statements—which were furnished to, and allegedly relied upon by Johnson & Johnson—to overstate sales, inflate trade receivables, and understate the liability to provide cash refunds to customers.[4] The misstated financial statements, in turn, allegedly induced Johnson & Johnson to pay more for the pharmaceutical business than it otherwise would have. (D.I. 11 at 5.) Johnson & Johnson seeks damages, measured as the amount by which cash refunds paid to customers (following Johnson & Johnson's acquisition of the business but relating to pre-acquisition promotional sales of pharmaceutical products) exceeded the balance in the reserve account. (D.I. 1 at ¶¶ 15, 20–21, 26–29; D.I. 11 at 6–7.) More simply put, plaintiff seeks to recover the amount by which Cooper understated its refund liability.[5] (D.I. 11 at 5.) John-

---

**1.**  (*See* D.I. 1 at ¶¶ 33–35.)

**2.**  (*See* D.I. 1 at ¶¶ 6–8, 10–19.) Among Cooper's list of representations and warranties contained in the Purchase Agreement was the following: Since the end of its fiscal year on October 31, 1986, Cooper has not "with respect to any [p]roducts, offered extended dating to the trade, increased or *decreased prices (except as set forth in published price lists)*, used free goods to lower the effective selling price or participated in any unusual transfers to subsidiaries or affiliates." (D.I. 8, Ex. A, § 5(j) at p. 27 [emphasis added].) The Purchase Agreement also contains Cooper's express representation that it did not, subsequent to January 1, 1986, sell or dispose of any assets of the pharmaceutical business or incur any liabilities except in the ordinary course of business. (D.I. 8, Ex. A, § 5(t) at pp. 35–37.)

**3.**  Relevant here is the following representation by Cooper in the Purchase Agreement:
As of the Closing [i.e. December 31, 1986], all the Trade Receivables will (i) represent bona fide indebtedness incurred by the applicable account debtors, (ii) have arisen on or prior to the closing in the ordinary course of the Pharmaceutical Business, (iii) be subject to no prior assignment, claim, lien or security interest and (iv) be collectible in full when due in the ordinary course of business, net of the reserves therefor shown on the Closing Date Financial Statement.
(D.I. 8, Ex. A, § 5(s) at p. 9.)

**4.**  The Purchase Agreement provided that Cooper would supply Johnson & Johnson with financial statements of the pharmaceutical business for the fiscal year ended October 31, 1986. The financial statements were to be:
(A)  ... in accordance with the books of account and records of [Cooper] and the assumptions stated therein, (B) present fairly the financial condition and results of operations of the Pharmaceutical Business as of the date and for the period indicated using such assumptions and (C) have been prepared in accordance with generally accepted accounting principles and such assumptions applied on a consistent basis throughout the periods covered thereby.
(D.I. 8, Ex. A, § 5(p) at p. 34.)

**5.**  (*See* D.I. 8, Ex. A, § 16(a) at p. 58.) Under the Purchase Agreement, Cooper agreed:
to indemnify and hold Purchaser harmless from and against any and all claims, damages, liabilities, liens, losses or other obligations whatsoever, together with costs and expenses, *including fees and disbursements of counsel* (collectively, "Losses"), arising out of or resulting from any of the following:
(i) inaccuracy of any representation or the breach of any warranty, covenant or agreement of [Cooper] contained in this Agreement or in any agreement, certificate or other instrument delivered by [Cooper] pursuant to this Agreement....

son & Johnson calculated its damages to be $2.61 million as of the commencement of this lawsuit. (D.I. 1 at ¶¶ 15, 21, 35.) Additionally, it requests an award of punitive damages because of the alleged fraud. (D.I. 1 at 10; D.I. 22 at 16.)

While the only signatories to the Purchase Agreement are Johnson & Johnson and Cooper, another entity, Johnson & Johnson's Iolab subsidiary, is inextricably linked to the transaction. First and foremost, Iolab's close relationship to the transaction is apparent from the fact that many of the assets and liabilities of the pharmaceutical business were transferred to it. (D.I. 7 at 3–4; D.I. 11 at 6, 12; D.I. 12 at ¶ 9.)

The Purchase Agreement explicitly authorized Johnson & Johnson to assign its rights thereunder to one or more of its subsidiaries.[6] This in fact was done, as Johnson & Johnson assigned some of its rights under the Purchase Agreement to Iolab. (D.I. 8, Ex. B at 1; D.I. 11 at 5–6.) Certain of the assets and liabilities of the pharmaceutical business were transferred to Johnson & Johnson (including the goodwill of the business), with the balance transferred to Iolab. (D.I. 11 at 5–6; D.I. 12 at ¶ 9.)

Under the heading "Acquired Assets," the Purchase Agreement sets forth those assets transferred by Cooper which comprise the pharmaceutical business. (D.I. 8, Ex. A, § 2(b) at pp. 4–10.) The allocation of those assets as between Johnson & Johnson and Iolab was accomplished by two related instruments. The first instrument, which was executed by Cooper and Johnson & Johnson and is entitled "Bill of Sale, Assignment and Assumption Agreement," shall be referred to herein as the "Johnson & Johnson Bill of Sale." (*See* D.I. 8, Ex. C.) It lists those assets of the

pharmaceutical business transferred to Johnson & Johnson. (*Id.* at pp. 2–3.)

The second instrument was executed between Cooper and Iolab. It too is entitled "Bill of Sale, Assignment and Assumption Agreement," and will be referred to herein as the "Iolab Bill of Sale." (*See* D.I. 8, Ex. B.) It details those assets of the pharmaceutical business conveyed to Iolab. (*Id.* at pp. 2–7.) Most notable for present purposes, the Iolab Bill of Sale transferred to Iolab "all trade accounts receivable in existence as of the Closing arising out of the sale of Products by, or for the account of, [Cooper] in the United States." (*Id.* § 2(ix) at p. 7.) As indicated above, it is the alleged overstatement of these trade accounts receivable, and the concomitant understatement of the obligation to provide refunds to customers, which lies at the root of this lawsuit. Not only was Iolab the entity which received the accounts receivable of Cooper's pharmaceutical business, it was also Iolab which assumed the obligation to provide customer refunds, and which indeed paid the $2.61 million in alleged excess refunds. (*See* D.I. 11 at 5–6.)

It is noteworthy that the Johnson & Johnson Bill of Sale and the Iolab Bill of Sale were executed concurrently on December 31, 1986—the same date as the closing of the Purchase Agreement. Both the Johnson & Johnson Bill of Sale and the Iolab Bill of Sale specifically refer to one another (D.I. 8, Ex. B at 7–8, 14; D.I. 8, Ex. C at 3–4, 10), as well as to the Purchase Agreement. (D.I. 8, Ex. B at 1; D.I. 8, Ex. C at 1.) From all of the foregoing, it is patently obvious that the Purchase Agreement, the Johnson & Johnson Bill of Sale, and the Iolab Bill of Sale were not prepared in isolation. All three instruments are related components of a larger transaction.

---

(*Id.*)

6. (D.I. 8, Ex. A, § 21 at pp. 69–70.) The Purchase Agreement provides that Johnson & Johnson:

> may assign its rights under this Agreement or any of them to one or more direct or indirect wholly-owned subsidiaries of [Johnson & Johnson].... This Agreement shall be binding upon and inure to the benefit of the par-

ties hereto and their respective permitted assignees. Nothing herein expressed or implied is intended to confer upon any person, other than the parties hereto and their respective permitted assignees, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

(*Id.*)

Aside from the fact that the very same assets and liabilities which underlie this lawsuit were conveyed to Iolab, there are several other manifestations of Iolab's close involvement with this transaction. First, Iolab was represented in the negotiations which culminated in the sale of Cooper's pharmaceutical business. Plaintiff's own papers identify Mr. Terry Johnson, an Iolab officer, as one of the principal negotiators of the transaction. (*See* D.I. 1 at ¶ 22; D.I. 11 at 7; D.I. 12 at ¶ 6.) Second, of the $260 million total price tag for Cooper's pharmaceutical business, $70 million was paid directly to Cooper by Iolab. (D.I. 11 at 5; D.I. 12 at ¶ 8.) Finally, to the extent customer refunds paid by Iolab were excessive, Cooper maintains that this resulted not from any understatement of liabilities on the part of Cooper, but rather, from Iolab's mismanagement of the pharmaceutical business subsequent to its acquisition. (D.I. 17 at 1, 5, 9, 11; D.I. 22 at 4.) Evidence of Iolab's operation of the business thus may play a pivotal role in ultimately resolving this dispute on its merits.

Johnson & Johnson commenced this action on December 28, 1988, by filing its Complaint against Cooper in this Court. (*See* D.I. 1.) Plaintiff asserts subject matter jurisdiction on the basis of the parties' diversity of citizenship. Iolab was not named as a party plaintiff, nor could it have been, for Iolab, like defendant Cooper, is incorporated in and therefore is a citizen of Delaware for diversity purposes. Hence joinder of Iolab would destroy this Court's diversity-based subject matter jurisdiction.

*See Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806); *Bonar, Inc. v. Schottland*, 631 F.Supp. 990, 993 (E.D.Pa.1986).

In the absence of Iolab, this Court will be unable to compel the appearance as witnesses of any Iolab officers or employees who do not reside in Delaware. As far as the record reveals, no Iolab officers or employees reside in Delaware. Mr. Terry Johnson, the Iolab officer who actively participated in negotiating the Purchase Agreement, resides and works in California. (D.I. 11 at 7; D.I. 12 at ¶ 7.) Mr. Johnson's testimony as to the misrepresentations allegedly perpetrated by Cooper's negotiators may prove to be crucial in deciding the merits of this dispute. The Iolab personnel familiar with the distribution of customer refunds live and work in Puerto Rico (*see* D.I. 13), which, according to plaintiff, is Iolab's principal place of business.[7] (D.I. 11 at 5; D.I. 12 at ¶ 8; D.I. 13 at ¶ 1.) Their testimony might be material to the issue of whether or not the payment of any excess refunds resulted from mismanagement by Iolab. These individuals, like Mr. Johnson, are beyond this Court's subpoena power.

Prior to filing the motions now before this Court, Cooper brought a related action in state court in California (the "California litigation"). The issues to be adjudicated in the California litigation parallel those of the instant lawsuit. Cooper's Complaint in the California litigation requests "a judgment declaring that Cooper has not breached the Purchase Agreement and does not have any liability to Iolab for pharmaceuti-

---

7. Cooper maintains that Iolab's principal place of business is in California, not in Puerto Rico. (D.I. 7 at 4; D.I. 8 at ¶ 6.)

The information on this point contained in filings by Johnson & Johnson is somewhat confusing. Iolab, *Inc.* is described as a wholly-owned subsidiary of Johnson & Johnson, incorporated in Delaware and having its principal place of business in Puerto Rico. (D.I. 11 at 5; D.I. 12 at ¶ 8.) Meanwhile, the Johnson & Johnson filings also allude to an Iolab *Corporation.* Iolab *Corporation* is said to be a wholly-owned Johnson & Johnson subsidiary, incorporated and headquartered in California. (D.I. 11 at 7 n. 1; D.I. 12 at ¶ 7.) Johnson & Johnson does not reveal whether the principal place of business of Iolab *Corporation* is different from its California headquarters.

Adding to the confusion is the status of Mr. Terry Johnson, whose position is described variously as vice president of Iolab Corporation (D.I. 11 at 7; D.I. 12 at ¶ 6), and as president of Iolab, Inc. (D.I. 7 at 6; D.I. 8 at ¶ 7; D.I. 22 at 19.)

There is some uncertainty as to whether Iolab, Inc. and Iolab Corporation are separate entities, and if so, what role, if any, was played in this transaction by Iolab Corporation. However, the record is clear that assets of Cooper's pharmaceutical business (including the trade accounts receivable) were conveyed to Iolab, Inc., the Delaware corporation.

cal products returned after December 31, 1986." (D.I. 8, Ex. E at 17.) All three of the players in this corporate *ménage à trois*—Cooper, Johnson & Johnson, and Iolab—are parties to the California litigation, in marked contrast to the action pending here which does not include Iolab.

## III. ANALYSIS

Deciding Cooper's motion to dismiss for failure to join an indispensable party requires a two-step analysis. *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1042 (9th Cir.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983); *Florida Ins. Guar. Ass'n, Inc. v. Carey Canada, Inc.*, 123 F.R.D. 356, 357–58 (S.D.Fla.1988); *Wylain, Inc. v. Kidde Consumer Durables Corp.*, 74 F.R.D. 434, 436 (D.Del.1977). First, the Court must determine whether Iolab is a "person to be joined if feasible" under Rule 19(a). That is, using the more traditional terminology, the Court first decides whether Iolab is a so-called "necessary party." *See Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 116–18 & n. 12, 88 S.Ct. 733, 741–42 & n. 12, 19 L.Ed.2d 936 (1968); *Pujol v. Shearson American Express, Inc.*, 877 F.2d 132, 134 (1st Cir.1989).

If Iolab is found to be a necessary party, the Court then proceeds to the second step in the analysis, which is contained in Rule 19(b). The inquiry facing the Court under Rule 19(b) is whether, "in equity and good conscience the action should proceed among the parties before it, or [alternatively, whether the action] should be dismissed." Rule 19(b), Fed.R.Civ.P. Dismissal of the action follows from a finding that Iolab is an "indispensable party." The terms "necessary party" and "indispensable party" are conclusory. *See Provident Tradesmens Bank v. Patterson*, 390 U.S. at 118–19 n. 15, 88 S.Ct. at 742–43 n. 15 (quoting Rule 19, Fed.R.Civ.P., advisory committee's note). Thus the use of these terms may follow from the appropriate analysis under Rule 19, but cannot take the place of that analysis.

Rule 19(a) identifies three categories of necessary parties. Rule 19(b) lists four factors to be considered by courts in determining whether a necessary party is also indispensable. There is some overlap between the analysis required under Rule 19(a), and that mandated by Rule 19(b). *See Acton Co., Inc. of Mass. v. Bachman Foods, Inc.*, 668 F.2d 76, 81 (1st Cir.1982); *Lopez v. Shearson American Express, Inc.*, 684 F.Supp. 1144, 1149 (D.P.R.1988). Furthermore, the four factors listed within Rule 19(b) are themselves overlapping to some extent. *Florida Ins. Guar. Ass'n v. Carey Canada*, 123 F.R.D. at 359; Rule 19, Fed.R.Civ.P., advisory committee's note.

Determining whether or not Iolab is indispensable to this litigation requires a fact-specific, flexible analysis. *See Provident Tradesmens Bank v. Patterson*, 390 U.S. at 118, 88 S.Ct. at 742; *Helzberg's Diamond Shops, Inc. v. Valley West Des Moines Shopping Center, Inc.*, 564 F.2d 816, 819 (8th Cir.1977); *Prescription Plan Service Corp. v. Franco*, 552 F.2d 493, 496 (2d Cir.1977). Rule 19 contains no prescribed formula, and cannot be applied in a mechanical way. *Provident Tradesmens Bank v. Patterson*, 390 U.S. at 118 & n. 14, 88 S.Ct. at 742 & n. 14; *Francis Oil & Gas, Inc. v. Exxon Corp.*, 661 F.2d 873, 878 (10th Cir.1981). The Court is vested with substantial discretion in making the determination. *Envirotech Corp. v. Bethlehem Steel Corp.*, 729 F.2d 70, 75 (2d Cir.1984); *Micro–Medical Indus., Inc. v. Hatton*, 607 F.Supp. 931, 935 (D.P.R.1985). *See also Northrop v. McDonnell Douglas*, 705 F.2d at 1043 (appellate court's standard of review is abuse of discretion).

### A. *Rule 19(a): "Necessary Party"*

The first step in the Court's analysis is to decide whether, pursuant to Rule 19(a), Iolab is a person to be joined if feasible.

The label of "necessary party" fits Iolab if, in its absence, (1) complete relief cannot be accorded the present parties, or (2) the disposition of the action would prejudice, as a practical matter, Iolab's ability to protect its own interest, or (3) any of the present parties would be subject to a substantial

risk of multiple or inconsistent obligations.[8] *Micro–Medical v. Hatton*, 607 F.Supp. at 933. The Court will briefly discuss these three categories of necessary parties in reverse order, mindful of the overlap with Rule 19(b) and that the analysis under Rule 19(b), *infra*, will be in greater depth.

Starting with the third category, Cooper runs the risk of incurring duplicate obligations if this action is permitted to continue. First, Johnson & Johnson might succeed in recovering from Cooper on the breach of contract and fraud claims it asserts here. Not being a party to this action, quite possibly Iolab would not be bound by its outcome, and would remain free to sue Cooper in another forum for what are essentially the same damages.

If on the other hand Iolab, though not a party to this action is nevertheless bound by it, then Iolab's ability to protect its interests would be seriously impaired. In such a case Iolab would fall within the second category of necessary parties outlined in Rule 19(a).

The first category of necessary parties includes those persons, the absence of whom would prevent relief from being accorded among the present parties. While Johnson & Johnson would be able, even without the benefit of Iolab's presence, to fully litigate its own claims here, Cooper would remain exposed to a subsequent lawsuit by Iolab arising out of the same transaction. In this sense, any relief afforded Cooper herein cannot be regarded as "complete."

For the foregoing reasons, and reemphasizing Iolab's close connection with this entire transaction,[9] the Court concludes that Iolab is a necessary party. Were it feasible, the Court would order the joinder of Iolab pursuant to Rule 19(a).

## B. *Rule 19(b): "Indispensable Party"*

Iolab cannot be added to this lawsuit, for to do so would destroy the Court's diversity jurisdiction. Having ruled that Iolab is a necessary party, the Court now turns to the more difficult second part of its two-step analysis. The relevant inquiry becomes whether Iolab is indispensable. The Court must consider whether this action should forge ahead despite the absence of Iolab, a party whose presence would obviously have been desirable, or whether instead the action should be dismissed.

Rule 19(b) sets forth four nonexclusive, overlapping factors to be considered by courts in evaluating whether an absent party is indispensable.[10] *See* Rule 19, Fed.R. Civ.P., advisory committee's note (the four "factors [contained in Rule 19(b)] are to a certain extent overlapping, and they are not intended to exclude other considerations which may be applicable in particular situations"). The Supreme Court has distilled from Rule 19(b) essentially four constituencies whose interests are balanced by the rule. Those four constituencies are: (1) the defendant, (2) the absent party, (3) the courts and the public, and (4) the plaintiff.[11] *Provident Tradesmens Bank v.*

> [F]irst, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.
>
> Rule 19(b), Fed.R.Civ.P.

**8.** The precise language of Rule 19(a) calls for the joinder of a person:

> if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.
>
> Rule 19(a), Fed.R.Civ.P.

**9.** *See* discussion under Background Facts, *supra*.

**10.** The four factors are:

**11.** This Court recites the four constituencies in a slightly different order from that used by the Supreme Court, which itself varied the order from Rule 19(b). *See Provident Tradesmens Bank v. Patterson*, 390 U.S. at 109 n. 2, 88 S.Ct.

*Patterson*, 390 U.S. at 109–111, 88 S.Ct. at 737–38. *See also Envirotech v. Bethlehem Steel*, 729 F.2d at 73; *Prescription Plan Service v. Franco*, 552 F.2d at 497. The Court will consider, in turn, the interests of each of these four constituencies in the context of this case.

### 1. The Defendant's Interest—Cooper

The first interest to be considered by the Court in applying Rule 19(b) is that of the defendant, Cooper, in avoiding multiple litigation and inconsistent obligations. *See Provident Tradesmens Bank v. Patterson*, 390 U.S. at 110, 88 S.Ct. at 738. Cooper's interest hinges largely upon the preclusive effect on Iolab, if any, of a decision rendered in this Court on the merits of the case.

Claim preclusion (*res judicata*) may be asserted in a later action only by and against parties, and those in privity with parties to the earlier action. *See generally* 1B J. Moore, J.D. Lucas & T. Currier, *Moore's Federal Practice* ¶ 0.405[1], at 178 (2d ed.1988). *See also Provident Tradesmens Bank v. Patterson*, 390 U.S. at 110, 88 S.Ct. at 738 ("Of course, since the outsider is not before the court, he cannot be bound by the judgment rendered."); Restatement (Second) of Judgments § 34(3) (1982). Similarly issue preclusion (collateral estoppel) may be asserted only against parties, and those in privity with parties to an earlier action.[12] *See generally* 1B *Moore's Federal Practice* ¶ 0.411[1], at 386–87.

■ As a nonparty, Iolab will thus be free to litigate anew, in another forum, any claims or issues decided unfavorably to it in this action, unless Iolab is held to be in privity with Johnson & Johnson. The fact that Iolab is Johnson & Johnson's wholly-owned subsidiary is insufficient to establish privity between the two entities. *See*

*Moore's Federal Practice* ¶ 0.411[10], at 471, 474, 478.

In *Astron Indus. Assoc., Inc. v. Chrysler Motors Corp.*, 405 F.2d 958 (5th Cir. 1968), the court held that a plaintiff-parent corporation's lawsuit was barred by *res judicata*, based upon the outcome of an earlier action brought by the plaintiff's subsidiary against the same defendant, arising out of the same operative facts. In invoking *res judicata*, the Fifth Circuit affirmed the district court's finding of privity between the parent corporation (the plaintiff in that lawsuit), and its subsidiary (plaintiff in the earlier lawsuit). *Astron v. Chrysler*, 405 F.2d at 961.

Two aspects of the decision in *Astron v. Chrysler* warrant particular attention. First, the court there emphasized the importance to a finding of privity that the plaintiff in the second action had controlled the first lawsuit. The parent "would be in privity with [its subsidiary] if [the parent] *controlled* the earlier lawsuit and its interests were represented" by the subsidiary in that earlier action. 405 F.2d at 961 (emphasis added). The Fifth Circuit's determination that the parent had controlled its subsidiary's prior lawsuit was quite logical given the facts of *Astron v. Chrysler*. The parent "completely controlled [the subsidiary] as its sole shareholder, an officer of [the parent] operated [the subsidiary], and the Board of Directors of [the parent] authorized the initial lawsuit by" the subsidiary against the defendant. 405 F.2d at 961. On this basis the instant action is easily distinguished from *Astron v. Chrysler*. Here, it can hardly be said that Iolab, Johnson & Johnson's *subsidiary* and the prospective plaintiff in a later lawsuit, *controlled* the present lawsuit brought by its corporate *parent*.

The second noteworthy feature of the *Astron v. Chrysler* decision is that the court stressed that the question of whether two parties are in privity for preclusion

---

at 738 n. 2; *Prescription Plan Service v. Franco*, 552 F.2d at 497 n. 3.

**12.** In contrast to claim preclusion, issue preclusion may be asserted *by* strangers to the earlier proceeding; although like claim preclusion, it may only be asserted *against* parties to the earli-

er case and their privies. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Blonder–Tongue Laboratories, Inc. v. University of Illinois Found.*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

purposes is one of fact. *Astron v. Chrysler,* 405 F.2d at 961 (the "determination of identity between litigants for the purpose of establishing privity is a factual question"). *See also Micro–Medical v. Hatton,* 607 F.Supp. at 934 (a "finding of privity in a later suit would likely result from an evidentiary examination into the actual participation or control by [the parent] of the subsidiary's [earlier] litigation").

It would be premature for this Court to endeavor to decide whether Iolab and Johnson & Johnson are in privity in bringing the instant action, for purposes of determining the preclusive effect of this action on a later lawsuit, where the potential later lawsuit is yet to be brought, and where the instant action has not even run its course yet. What is relevant however, and what the Court may properly decide at this juncture is that: (a) there is a substantial likelihood that a court would find, at some future date, that Johnson & Johnson and Iolab were *not* in privity in bringing the instant lawsuit, (b) therefore any findings in this case adverse to Iolab would likely have no preclusive effect upon Iolab in a subsequent suit by Iolab against Cooper, and (c) allowing this suit to continue therefore subjects Cooper to the risk of duplicate liability—to Johnson & Johnson now, and to Iolab later.

The Court notes in passing that privity between Johnson & Johnson and Iolab likewise will probably not lie in their relationship as partial assignor and assignee of the Purchase Agreement. In general an assignee is regarded as in privity with its assignor for preclusion purposes only if the assignment occurred *after* the initial lawsuit was brought. *Industrial Credit Co. v. Berg,* 388 F.2d 835, 841 (8th Cir. 1968); *Wight v. Chandler,* 264 F.2d 249, 253 (10th Cir.1959); *Montana Bank of Circle v. United States,* 7 Cl.Ct. 601, 614 (1985); *Gramatan Home Investors Corp. v. Lopez,* 46 N.Y.2d 481, 414 N.Y.S.2d 308, 312, 386 N.E.2d 1328, 1332 (1979);[13] Restatement (Second) of Judgments § 55 & comment a (1982). Here the partial assignment to Iolab occurred on or before the closing date of the Purchase Agreement (December 31, 1986),[14] whereas the instant lawsuit commenced with the filing of the Complaint on December 28, 1988. (D.I. 1.) Accordingly, Johnson & Johnson and Iolab likely are not privies, for purposes of claim and issue preclusion, merely because of their relationship as assignor and assignee which arose prior to filing this lawsuit.[15]

Cooper's most obvious concern is that it will be forced to pay twice—once to Johnson & Johnson, and then a second time to Iolab—for the same allegedly wrongful act. Yet even if there are no inconsistent or

---

**13.** The *Gramatan v. Lopez* case apparently announces the law of New York relative to privity between assignors and assignees of contracts. The case takes on added significance given that the Purchase Agreement here states that it "shall be governed by and construed in accordance with the laws of the State of New York." (D.I. 8, Ex. A, § 25 at pp. 71–72.)

The determination of whether or not a person is indispensable is a matter of federal law. Nevertheless, that determination requires a balancing of interests, and such interests may be rooted in state contract law. *See Rush & Halloran, Inc. v. Delaware Valley Fin. Corp.,* 180 F.Supp. 63, 65 (E.D.Pa.1960) (in determining whether plaintiffs' parent corporation was an indispensable party, the court found relevant the fact that state contract law conferred upon plaintiffs a right to bring suit as donee third-party beneficiaries).

**14.** The Iolab Bill of Sale, executed concurrently with the Purchase Agreement on December 31, 1986, provides that Johnson & Johnson "has

assigned its right to purchase the Acquired Assets described herein to [Iolab] in accordance with the terms of the Purchase Agreement." (D.I. 8, Ex. B at 1.)

**15.** *Cf.* 7 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1613 (1986).

An assignor of rights and liabilities under a contract is not needed for a just adjudication of a suit brought by the assignee; indeed, in most cases the assignor would not even be a proper party inasmuch as he may have lost his right to bring an independent action on the contract by virtue of the assignment. However, when there only has been a partial assignment, courts may require joinder so that the entire contractual interest that is in dispute is represented in the action.

*Id.* at pp. 188–190 (footnotes omitted). While downplaying the importance of the *assignor's* (i.e. Johnson & Johnson's) presence in a contractual dispute, the above-quoted language implicitly recognizes that the *assignee's* (i.e. Iolab's) presence is vital.

duplicative judgments against Cooper, simply having to litigate twice that which could be decided in a single proceeding imposes an unnecessary burden upon Cooper. *See Provident Tradesmens Bank v. Patterson,* 390 U.S. at 110, 88 S.Ct. at 738 ("the defendant may properly wish to avoid multiple litigation").

Finally, Iolab's absence may impair Cooper's ability to fully assert its contention that, to the extent customer refunds were excessive, this fact resulted from Iolab's post-acquisition mismanagement of the pharmaceutical business and not from any fraud or breach of contract on the part of Cooper. While expressing no opinion as to the merits of this defense, the Court does note that Cooper's capacity to fully and fairly assert its defense is an interest to be protected.

In light of all the foregoing, the Court concludes that Cooper's interests would best be served by dismissing this action, rather than by proceeding without Iolab.

### *2. The Outsider's Interest—Iolab*

The second of four interests to be weighed by the Court in making its assessment under Rule 19(b) is that of Iolab, the absent party.

Even if, as seems likely, Iolab will not be precluded from subsequently raising any claims and issues similar or identical to those litigated in this action,[16] an unfavorable ruling here would nonetheless constitute adverse persuasive precedent, thereby harming Iolab's interest. *Acton v. Bachman Foods,* 668 F.2d at 78 ("[e]ven if [the absent party] would not be legally bound, an adverse ruling would be a persuasive precedent in a subsequent proceeding, and would weaken [the absent party's] bargaining position for settlement purposes"). The court in *Doty v. St. Mary Parish Land Co.,* 598 F.2d 885 (5th Cir.1979), phrased the proposition as follows:

> [Plaintiffs] correctly point out that the [absent party] would not be bound, in the *res judicata* sense, by an adjudication of the validity of [defendant's] title. None-

theless, the fact that a party may not be bound by a judgment does not mean that an action may proceed without him.... [I]n a subsequent suit between [plaintiffs] and the [absent party], an unfavorable judgment in the present case would constitute precedent adverse to the [absent party's] claims.

*Id.* at 887 (footnotes omitted).

Of course if, on the other hand, Iolab ultimately is held bound by claim or issue preclusion, then the prejudice to Iolab of allowing this action to proceed in its absence is even more clear-cut. Moreover, the fact that Iolab is a wholly-owned subsidiary of a party does not necessarily mean that Iolab's interests are adequately protected by its parent corporation so as to negate Iolab's indispensability. *See E.H. Crump & Co. v. Gatewood,* 497 F.Supp. 549, 551 (E.D.Ark.1980); *Lang v. Colonial Pipeline Co.,* 266 F.Supp. 552, 554 (E.D. Pa.), *aff'd,* 383 F.2d 986 (3d Cir.1967).

This is not a case in which the separate corporate existence of Johnson & Johnson and Iolab may be disregarded, with Johnson & Johnson viewed as a surrogate for Iolab; the former's presence excusing the latter's absence. For several reasons, the Court will not "pierce the corporate veil" of Iolab, or deem it to be a mere "alter ego" of Johnson & Johnson, so as to thereby ignore its absence.

"A subsidiary corporation may be deemed the alter ego of its corporate parent where there is a lack of attention to corporate formalities, such as where the assets of two entities are commingled, and their operations intertwined." *Mobil Oil Corp. v. Linear Films, Inc.,* 718 F.Supp. 260, 266 (D.Del.1989). In the instant case, however, there is no suggestion that the adherence to corporate formalities by Johnson & Johnson and Iolab was anything less than unwavering. (*See* D.I. 22 at 12 (at oral argument, plaintiff's counsel conceded that Johnson & Johnson and Iolab "are definitely different corporations").) Distinguish *Pujol v. Shearson American Express,* 877 F.2d at 135 (in concluding that

---

**16.** *See* discussion of Cooper's interest, *supra.*

the defendant's subsidiary was not an indispensable party, the court observed that "the subsidiary is a mere 'corporate shell' existing separately from defendant only on paper," and further referred to the "subsidiary's 'corporate alter ego' status").

Furthermore, the so-called alter ego or veil-piercing doctrine is typically employed by claimants *against* a *defendant* corporation as a vehicle for holding the corporation's shareholders or its parent company liable. In the case at bar, Johnson & Johnson is postured as a plaintiff. Even if Johnson & Johnson and Iolab had not rigidly observed their status as separate legal entities, it would still be highly unusual, if not unprecedented, for Johnson & Johnson to invoke the alter ego doctrine as a means of benefitting from its own inattention to corporate formalities. Johnson & Johnson chose to structure its affairs as it did—namely, with operating subsidiaries as distinct legal entities. It cannot now pretend that these separate entities are in fact one.

Finally, application of the alter ego doctrine requires that the use of the corporate form would, if left unchecked, operate as a fraud or injustice. *Mobil Oil v. Linear Films*, at 267, 268; *Lang v. Colonial Pipeline*, 266 F.Supp. at 558. The record in the present case, however, is devoid of any indication that plaintiff's operation of its corporate entities would effect a fraud or injustice of any kind. Accordingly, the alter ego or veil-piercing doctrine can have no application on the facts of this case.

It is conceivable that the presence here of Johnson & Johnson, which owns 100% of Iolab's stock, could vicariously protect Iolab's stake in this dispute. A more prudent solution, however, would be for the dispute to proceed in a forum where Iolab is present, and capable of safeguarding its own interests. For the reasons outlined above, the Court concludes that Iolab's interest would best be protected by dismissing this suit.

---

17. This public interest is embodied within the third factor listed under Rule 19(b): whether a judgment issued in the absence of the nonjoined person will be "adequate." *Provident Trades-*

### 3. Interest of the Courts and the Public

The third of four interests promoted by Rule 19(b) is that of the courts and the public.[17] The most palpable interest of this constituency is in having disputes resolved in the most efficient manner possible. *See Provident Tradesmens Bank v. Patterson*, 390 U.S. at 111, 88 S.Ct. at 738 (referring to "this public stake in settling disputes by wholes"); *Florida Ins. Guar. Ass'n v. Carey Canada*, 123 F.R.D. at 359 ("[j]udicial economy and the desire to settle disputes in a single forum whenever possible are considerations under this factor").

Litigating the merits of the present controversy in the California state courts—with all three of the principal actors present—will advance the public's interest in the efficient administration of justice. Surging forward in this forum—with one of the three key players missing—would not promote such an interest. On the contrary, it would spawn repetitious litigation because this Court cannot resolve the entire dispute.

It is also relevant to the public interest that the issue of Iolab's indispensability has been raised (and will be decided) at the outset of this lawsuit, rather than on appeal after a full trial on the merits. *Cf. Provident Tradesmens Bank v. Patterson*, 390 U.S. at 111, 88 S.Ct. at 739 ("[a]fter trial, considerations of efficiency of course include the fact that the time and expense of a trial have already been spent"). Dismissal at the present stage of this litigation would likely conserve considerable resources otherwise expended on discovery and trial. In this sense, the instant case is distinguishable from *Provident Tradesmens Bank v. Patterson*. There, the Supreme Court reversed the Court of Appeals' holding that an absent party was indispensable. 390 U.S. at 106–107, 88 S.Ct. at 736. In reaching its decision, the Supreme Court noted that the Rule 19 issue was first raised, apparently *sua*

---

*mens Bank v. Patterson*, 390 U.S. at 111, 88 S.Ct. at 739. The relevant language of Rule 19(b) is reproduced in note 10, *supra*.

*sponte,*[18] by the Court of Appeals only after a full trial on the merits had been conducted in the District Court. *Id.*

As stated above, there is great uncertainty as to the preclusive effect that a decision on the merits rendered by this Court might have upon subsequent proceedings. Yet even if the doctrines of claim and issue preclusion were to apply so as to minimize duplication of effort, "the result would in any case be to complicate and enlarge what would otherwise be a relatively straightforward contract action in a single court." *Acton v. Bachman Foods,* 668 F.2d at 81.

Regardless of whether or not the instant lawsuit in this Court is dismissed, the California litigation in which all three of the players in the dispute are joined is likely to continue. The Court concludes that the interest of the courts and public in the efficient administration of justice would best be served by dismissal of this case.

### 4. The Plaintiff's Interest—Johnson & Johnson

The fourth and final interest to be scrutinized under Rule 19(b) is that of the plaintiff. The plaintiff here, Johnson & Johnson, has made plain its preference for the action to proceed in this Court, notwithstanding the prospect of parallel litigation ongoing in the California state courts.

Rule 19(b) directs the Court to evaluate "whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder." In the context of the present dispute, the California state courts are available to provide a remedy which is not only *adequate,* but indeed *preferable.* This Court, saddled with the absence of Iolab, is essentially being asked by Johnson & Johnson to decide the case with one hand tied behind its back. In contrast, a California state court could grant complete relief among all three of the parties before it.

The Supreme Court has stated that "[t]he decision whether to dismiss (i.e., the decision whether the person missing is 'indispensable') must be based on factors varying with the different cases, some such

factors being substantive, some procedural, *some compelling by themselves,* and some subject to balancing against opposing interests." *Provident Tradesmens Bank v. Patterson,* 390 U.S. at 118–19, 88 S.Ct. at 742–43 (emphasis added). The availability of the California state courts to resolve this dispute is certainly persuasive, and approaches classification as a factor which is "compelling by itself." *See Francis Oil v. Exxon,* 661 F.2d at 881 (Logan, J., concurring) ("[t]he fourth factor, 'whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder,' is to me the key"); *Doty v. St. Mary Parish Land Co.,* 598 F.2d at 888 ("[t]he final factor is one which, in the end, we find to be most persuasive—the presence of an adequate forum if the action is dismissed"). *Cf. Wylain v. Kidde Consumer Durables,* 74 F.R.D. at 437 ("under the circumstances of this case, the most important equitable consideration is 'whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder' ").

In sum, it is highly relevant to this case that the California state courts are at the parties' disposal, and can provide relief superior to that which is attainable here. While the Court stops short of saying that dismissal would be in Johnson & Johnson's best interest, it does find that dismissal would not prejudice Johnson & Johnson unduly.

### C. Summary of Rule 19 Analysis

The Court first determined that Iolab is a necessary party. That is, Iolab is a person to be joined if feasible, pursuant to Rule 19(a). Iolab cannot be joined, however, because to do so would defeat the Court's diversity-based subject matter jurisdiction.

The Court therefore proceeded to consider whether the action should continue without Iolab, or whether instead, it should be dismissed, Iolab thus being regarded as an indispensable party. Four factors to be weighed by courts in performing the indispensable party analysis are listed in Rule

**18.** The indispensable party issue had not "been raised in the District Court or by the appellant."

*Provident Tradesmens Bank v. Patterson,* 390 U.S. at 106, 88 S.Ct. at 736.

19(b), which has been interpreted by the Supreme Court and by the lower courts. Courts must balance the interests of: (1) the defendant, (2) the absent party, (3) the courts and the public, and (4) the plaintiff.

The interests of the defendant, as well as those of the courts and the public, clearly favor dismissal of this action so that the entire controversy may be settled in a single forum. As for the absent party, Iolab, it is plausible that its interest would be satisfactorily represented via the presence here of its parent, Johnson & Johnson. Nevertheless, the safer approach, from Iolab's vantage point, is to require that the dispute proceed in a forum where Iolab is present, and thus able to look after its own interest. Hence Iolab's interest is best served by dismissing this suit, and deferring to the California state courts. Lastly, although the Court cannot hold that dismissal would advance the plaintiff's interest, it does find that dismissal would not unduly harm Johnson & Johnson, in view of the availability of an alternative forum.

Based upon the preceding analysis, the Court concludes that this action cannot, in equity and good conscience, proceed in Iolab's absence. Iolab is an indispensable party. Like a tripod with one missing leg, Iolab's absence causes this lawsuit to topple over, notwithstanding the presence of the other two legs—Cooper and Johnson & Johnson.

The Court's conclusion is buttressed by case law applying Rule 19 in the context of parent and subsidiary corporations.

"The jurisprudence is fairly uniform in cases involving a corporate parent and subsidiary that ... where the corporation is *a primary participant* in the facts that give rise to the complaint, that corporation is an indispensable party. Additionally, there seems to be no real significance whether the nondiverse corporation is a parent or a subsidiary."

*Lopez v. Shearson American Express,* 684 F.Supp. at 1150 (emphasis added). *See also Envirotech v. Bethlehem Steel,* 729 F.2d at 75–76 (in holding that the counterclaim defendant's parent corporation was an indispensable party, the court emphasized the parent's "degree of involvement" with the contracts at issue, which the court found to be "considerable").

Iolab was certainly "a primary participant"[19] in the events giving rise to this action. An Iolab officer was a leading negotiator of the Purchase Agreement. Iolab became a partial assignee of the Purchase Agreement, and furnished $70 million of the consideration paid to Cooper. Its "degree of involvement" with the contract at issue is no doubt "considerable." Accordingly, the Court's determination that Iolab is an indispensable party comes as no surprise.

In support of its argument that Iolab is not an indispensable party, Johnson & Johnson cites two cases which are superficially similar to the instant case. (D.I. 11 at 12–16.) In each of these two cases (*Micro–Medical Indus., Inc. v. Hatton,* 607 F.Supp. 931 (D.P.R.1985) and *McCormick & Co. v. Bedford Indus., Inc.,* 301 F.Supp. 29 (D.Md.1969)), a plaintiff-parent company contracted to acquire a business from the defendant. In each case a nonparty subsidiary of the plaintiff took title to the assets of the business. *Micro–Medical,* 607 F.Supp. at 934 ("certain of the assets" were transferred to the subsidiary); *McCormick,* 301 F.Supp. at 32 & n. 3. After disputes developed, the respective courts in both cases denied motions to dismiss, finding that the nonparty subsidiaries of plaintiffs were not indispensable. *Micro–Medical,* 607 F.Supp. at 935; *McCormick,* 301 F.Supp. at 35.

Both *Micro–Medical* and *McCormick* are distinguishable from the instant case. The nonparty subsidiaries in the cited cases played far narrower roles in the relevant

---

**19.** Whereas the court in *Lopez v. Shearson American Express* used the expression "*a* primary participant," 684 F.Supp. at 1150, at least one court has employed the term "*the* primary participant." *See Dernick v. Bralorne Resources, Ltd.,* 639 F.2d 196, 199 (5th Cir.1981). Although the Court hesitates to label Iolab, or anyone else, as *the* primary participant, it has no difficulty in describing Iolab as *a* primary participant. The latter term (i.e. *a* primary participant) appears to this Court to articulate a more meaningful standard.

transactions than Iolab did here. Unlike Iolab, neither of those two subsidiaries took part in negotiating the purchase agreements, and neither contributed toward the purchase price. *Micro–Medical,* 607 F.Supp. at 933–34; *McCormick,* 301 F.Supp. at 32.

More akin to the instant case is *Acton Co., Inc. of Mass. v. Bachman Foods, Inc.,* 668 F.2d 76 (1st Cir.1982). In *Acton v. Bachman Foods,* the plaintiff and its parent corporation, a nonparty, contracted to acquire the assets of a business from the defendants. 668 F.2d at 78. The nonparty parent took part in negotiating the contract, and furnished a deposit toward the purchase price. *Id.* Its subsidiary, the plaintiff, was designated in the contract as the purchaser. *Id.* The subsidiary-plaintiff agreed to undertake most of the obligations in the contract—including, presumably, the payment of the balance of the purchase price. *See id.* In an action on the contract, the First Circuit affirmed the trial court's determination that the nonparty parent corporation was indispensable. *Id.* at 81. In so doing, the court noted the absent party's "substantial role in negotiating" the contract, *id.* at 78, and alluded to its "substantial interest in" the contract. *Id.* at 82. The same can be said of Iolab in this case.

## IV. CONCLUSION

Having determined that Iolab is both a necessary party and an indispensable party, the Court will grant defendant Cooper's motion to dismiss for failure to join an indispensable party. Cooper's other two motions: (1) to dismiss this action on the ground that it was not brought in the name of the real party in interest, pursuant to Rule 17(a), Fed.R.Civ.P.; and (2) to transfer the case to the United States District Court for the Northern District of California, pursuant to 28 U.S.C. § 1404(a), will both be denied as moot.