### REMINGTON ARMS COMPANY, Plaintiff,

v.

### LIBERTY MUTUAL INSURANCE COMPANY, Defendant.

Civ. A. No. 89–420–JLL.

United States District Court, D. Delaware.

Sept. 27, 1990.

Richard D. Allen and Donald E. Reid of Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (Joanne B. Grossman, William F. Greaney and Philip D. Golrick of Covington & Burling, Washington, D.C., of counsel), for plaintiff.

Lawrence S. Drexler of Elzufon, Austin & Drexler, P.A., Wilmington, Del. (Joseph G. Manta, John C. Sullivan, Dorothy E. Carl, Robyn Leto and Karen C. Buck of Manta & Welge, Philadelphia, Pa., of counsel), for defendant.

## OPINION

LATCHUM, Senior District Judge.

Plaintiff Remington Arms Company ("Remington") seeks a declaratory judgment as to whether comprehensive general liability policies and first layer excess insurance policies issued by Liberty Mutual Insurance Company ("Liberty Mutual") require Liberty Mutual to defend and indemnify Remington in actions brought against Remington by the federal and state governments and private parties for environmental contamination at three Remington sites in Connecticut. Remington also seeks damages arising from Liberty Mutual's refusal to defend and indemnify Remington with respect to the environmental claims. The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds $50,000, exclusive of interest and costs, *see* Complaint, Docket Item ("D.I.") 1 at ¶ 4, and the parties are citizens

of different states.[1]

Presently before the Court are two motions: (1) Remington's motion to stay its claims regarding Liberty Mutual's duty to indemnify Remington in actions concerning two of the three sites (D.I. 48); and (2) Liberty Mutual's motion to join DuPont, Remington's corporate parent, and over one hundred of DuPont's excess insurers pursuant to Rule 19, Fed.R.Civ.P., or for leave to file a third party complaint against DuPont and the excess insurers under Rule 14, Fed.R.Civ.P. D.I. 35.[2] For the reasons stated below, the Court will deny both Remington's motion to stay its indemnification claims and Liberty Mutual's motion for joinder or for leave to file a third party complaint.

## FACTUAL BACKGROUND

### A. *Nature Of Underlying Environmental Claims*

Remington is engaged primarily in the business of manufacturing firearms and ammunition. *See* D.I. 1 at ¶ 2. Since the mid–1980s, Remington has been faced with administrative actions and lawsuits in connection with alleged environmental contamination at three sites in Connecticut: the Lordship Gun Club ("Lordship"), a shooting range in Stratford, Connecticut, owned and operated by Remington; the Remington Park facility ("Remington Park"), an ammunition manufacturing and waste disposal site in Bridgeport, Connecticut; and the Barnum Avenue facility ("Barnum Ave."), another ammunition manufacturing location in Bridgeport. *See generally* D.I. 1 at ¶¶ 12–19. Following is a brief summary of the status of the various government and private actions instituted against Remington in connection with each site.

### 1. *Lordship Gun Club*

Lordship is situated on a point jutting into Long Island Sound. *See* Exhibits to Liberty Mutual's Opening Brief in Support of Motion for Joinder, D.I. 43, Ex. E at 2–1. As a result of activities at Lordship since the mid–1920s, an estimated 4.8 million pounds of leadshot have accumulated along the coastline in the vicinity of Lordship, posing a threat to waterfowl which inhabit the area. *See id.* at "Executive Summary," 2–1, 3–8. On October 14, 1985, the Connecticut Department of Environmental Protection (CDEP), pursuant to the Connecticut Water Pollution Control Act, Conn. Gen.Stat. § 22a–432 (1989), ordered Remington to investigate the extent of contamination at and around Lordship and the feasibility of remedial measures. *See* D.I. 1 at ¶¶ 13, 14.[3]

On October 21, 1987, a private organization filed suit alleging that Remington is legally obligated under Section 505 of the Clean Water Act, 33 U.S.C. § 1365 (1988), and Sections 4005, 7002 and 7003 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6945, 6972, and 6973 (1988), to clean up pollution resulting from activities at Lordship. *See id.* at ¶ 15.

Remington represents that "[t]he investigation of contamination [at Lordship] has been largely completed. Although the particulars of the remedy which Remington must implement have not yet been determined, the CDEP already has ordered that Remington undertake remedial measures with respect to the Lordship site." *See* Ordija Affidavit, D.I. 47 at ¶ 11. The estimated cost of the recommended method for removing the leadshot from the area is $6–8 million. *See* D.I. 43, Ex. E at "Execu-

1. Remington is a Delaware corporation with its principal place of business in Wilmington, Delaware. It is a wholly owned subsidiary of another Delaware corporation, E.I. duPont de Nemours and Company ("DuPont"). *See* D.I. 1 at ¶ 2; Partnoy Affidavit, D.I. 19 at ¶ 3. Liberty Mutual is a Massachusetts corporation with its principal place of business in Boston, Massachusetts. *See* D.I. 1 at ¶ 3.

2. The parties also submitted briefs and the Court heard argument on Remington's motion to compel discovery responses from Liberty Mutual. The Court ruled on the discovery dispute by a separate order dated September 11, 1990. D.I. 64.

3. The CDEP subsequently required Remington to perform a study of the environmental impact of clay target fragments at the site. *See* D.I. 43, Ex. L at 1. The record does not reveal whether that investigation has been completed.

tive Summary," 6–4. The privately-initiated litigation concerning Lordship remains pending. *See* D.I. 1 at ¶ 15.

### 2. *Remington Park*

From approximately 1910 until 1989, Remington manufactured ammunition and ammunition components at Remington Park. *See* D.I. 47 at ¶ 2. The site was also used for disposal of wastes generated at Remington's Barnum Ave. location. *See id.* In May 1987, the CDEP commenced suit against Remington alleging that operations at Remington Park had caused environmental contamination in the vicinity. *See* D.I. 1 at ¶ 19; Liberty Mutual's Brief in Opposition to Stay, D.I. 55 at 5. Remington and the CDEP entered into a consent order on August 6, 1987, requiring Remington to close a surface impoundment at Remington Park and thereafter monitor the extent of groundwater contamination at the disposal site. *See* D.I. 1 at ¶ 19; D.I. 55 at 6 & Ex. E. The record indicates that Remington has since closed the surface impoundment. *See* D.I. 55, Ex. F at 20. Remington represents that the CDEP is currently "inactive" with respect to Remington Park. *See* D.I. 47 at ¶ 10.

On August 16, 1988, the United States Environmental Protection Agency ("EPA") notified Remington that it was a potentially responsible party under Section 3008(h) of RCRA, 42 U.S.C. 6928(h) (1988), for environmental contamination in and around Remington Park, and on November 27, 1989, the EPA ordered Remington to undertake an investigation. *See* D.I. 47 at ¶ 3; *compare* D.I. 55 at 7 n. 1 & Ex. F (indicating EPA order issued September 12, 1989). Remington does not expect to complete its investigation until 1993, after which a determination will be made as to Remington's responsibility to effect remedial measures. *See* D.I. 47 at ¶ 5. In the meantime, Remington may be required to perform interim corrective measures. *See id.* at ¶ 3.

### 3. *Barnum Ave.*

From approximately 1910 until 1986, Remington manufactured shotshell, rimfire and centerfire small arms ammunition at Barnum Ave. *See id.* at ¶ 6. On February 9, 1988, the CDEP, pursuant to Conn.Gen. Stat. §§ 22a–424 and 22a–432 (1989), ordered Remington to conduct an investigation of groundwater, sediment and surface contamination in the vicinity of Barnum Ave. (*see* D.I. 1 at ¶ 17; D.I. 47 at ¶ 7), which investigation Remington completed in January 1989. *See* D.I. 47 at ¶ 8; D.I. 55 at Ex. D. Remington represents that "[t]he questions of whether Remington should be required to take [sic] any additional investigations or any remedial actions and, if so, what they should consist of, are now before the CDEP." *See* D.I. 47 at ¶ 9. Remington has had no word from the CDEP since April 6, 1989. *See id.*

### B. *Remington's Insurance Coverage*

Remington purchased primary and excess liability insurance policies from Liberty Mutual from 1936 to 1980. *See* Franklin Affidavit, D.I. 56 at ¶ 2. Specifically, Liberty Mutual was Remington's only primary insurer from 1936 to 1980, and while Remington's insurance records are incomplete, Remington believes that for the period from 1965 to 1980 its primary policies each afford coverage of $1 million per occurrence. *See id.* In addition, Remington purchased first layer excess insurance from Liberty Mutual from 1965 through 1980. *See id.* at ¶ 3. The per occurrence limit of coverage for each of the excess policies is $5 million from 1965 through 1970, $1.5 million from 1971 to September 25, 1972, and $4 million from September 25, 1972 through 1980. *See id.*

In 1980, Remington became a wholly owned subsidiary of DuPont, which had long been a majority stockholder of Remington. *See* D.I. 19 at ¶ 3. In March 1970, Remington became a named insured on Du-Pont's excess insurance policies. *See* D.I. 56 at ¶ 4. DuPont is self-insured up to the minimum attachment point of its excess insurance policies. *See id.* The minimum attachment points applicable to Remington are $2.5 million per occurrence from March 1970 to March 1972, and $5 million per occurrence from March 1972 to March

1986. *See id.* Thus, there was no overlap of excess coverage between the policies issued by Liberty Mutual and those issued by DuPont's excess insurers except during a period from March 1970 to January 1971, during which Liberty Mutual provided excess coverage up to $5 million per occurrence and the minimum attachment point for excess coverage under the DuPont program was $2.5 million per occurrence.[4] Remington estimates that the total amount of coverage under its Liberty Mutual primary and excess policies is at least $83 million for the period from 1961 to 1980, with several million dollars more coverage for the period from 1936 to 1960. *See id.* at ¶ 7.

## DISCUSSION

### A. *Remington's Motion To Stay Indemnification Claims*

■ Remington petitions the Court to stay its claims regarding Liberty Mutual's duty to indemnify Remington with respect to Remington Park and Barnum Ave. because Remington's liability for the cleanup of those sites is "undefined," whereas its responsibility for pollution at Lordship is established and it is now simply a matter of deciding which of several remedial measures to implement. *See* Remington's Opening Brief in Support of Motion to Stay, D.I. 49 at 2, 10. Remington argues that if its indemnification claims proceed, and Remington is exonerated of liability in the pending administrative proceedings and state court litigation, the Court will have expended needless effort in determining whether Liberty Mutual has a duty to indemnify Remington for such liability. *See id.* at 9. In addition, Remington claims that because it would have to litigate some of the same factual issues against its insurer as in the underlying actions, Remington's defense of the underlying actions might be compromised by evidence it must develop to establish its right to insurance coverage in the declaratory judgment ac-

tion. *See id.; see also* Transcript of Oral Argument, D.I. 65 at 25–26.

Finally, Remington argues that given the present uncertainty regarding the nature and extent of contamination at Remington Park and Barnum Ave., depositions of witnesses with knowledge of the two sites will be "unfocused" and burdensome. *See* D.I. 65 at 28.

Liberty Mutual opposes Remington's motion to stay on the following grounds: (1) this action and the underlying proceedings do not involve the same factual questions or legal issues; (2) because discovery and evidence pertaining to each site is likely to overlap with the other sites, coverage disputes as to all three sites should be resolved simultaneously to avoid duplication of effort; (3) separate resolution of Remington's defense and indemnification claims promotes duplicative litigation; and (4) Liberty Mutual will be prejudiced by an indefinite delay of the indemnification claims because relevant information might be lost with the passage of time. *See* D.I. 55 at 13, 17–18, 20.

"The power to stay proceedings is incidental to the power inherent in every court to schedule disposition of the cases on its docket so as to promote fair and efficient adjudication." *Gold v. Johns–Manville Sales Corp.*, 723 F.2d 1068, 1077 (3d Cir. 1983). In *Terra Nova Ins. Co. v. 900 Bar, Inc.*, 887 F.2d 1213 (3d Cir.1989), the Third Circuit, speaking specifically in the context of an insurance coverage declaratory judgment action, stated that " 'although both justiciability and federal jurisdiction are present, the court in a proper case may, nevertheless, refuse to proceed with the declaratory action for it is well settled that the exercise of jurisdiction in this area is discretionary.' " *Id.* at 1225 (quoting 6A J. Moore, J. Lucas & G. Grotheer, Jr., Moore's Federal Practice ¶ 57.19, at 57–206 (2d ed. 1989) (footnotes omitted)).

The Court agrees with the parties[5] that the Remington Park and Barnum Ave. in-

---

4. This excess coverage of DuPont's was purchased from Aetna Casualty and Surety Company. *See* D.I. 56 at ¶ 5.

5. *See* D.I. 49 at 6; D.I. 55 at 7.

demnification claims are justiciable. *See Riehl v. Travelers Ins. Co.*, 772 F.2d 19, 22–23 (3d Cir.1985) (case ripe for adjudication because all relevant events, i.e., dumping of wastes and leaching off property, had occurred); *ACandS, Inc. v. Aetna Casualty & Surety Co.*, 666 F.2d 819, 822–23 (3d Cir.1981) (insured's suit seeking damages and declaratory relief justiciable even though underlying actions still pending). Thus, Remington, as movant, bears the burden of demonstrating that a stay is warranted. *See Gilbane Bldg. Co. v. Nemours Found.*, 568 F.Supp. 1085, 1088 (D.Del.1983).

The *Terra Nova* court identified the following factors as relevant to a determination of whether or not to stay a declaratory judgment action: " '(1) the likelihood that the declaration will resolve the uncertainty of obligation which gave rise to the controversy; (2) the convenience of the parties; (3) the public interest in a settlement of the uncertainty of obligation; ... (4) the availability and relative convenience of other remedies;' " and (5) whether " 'the same factual question' lies at the heart of both an insurance coverage dispute and the underlying ... action." *Terra Nova*, 887 F.2d at 1224, 1225. Application of the "*Terra Nova* factors" to the case at bar leads the Court to conclude that a stay is unwarranted.

Unquestionably, a declaratory judgment "will resolve the uncertainty of obligation which gave rise to the controversy." Even an interpretation of the insurance policies contingent upon the outcome of the underlying actions, e.g., Liberty Mutual must indemnify if Remington is liable for cleanup costs, will be sufficient to guide the parties' future course of conduct. *See ACandS*, 666 F.2d at 823; *Keene Corp. v. Insurance Co. of N. America*, 667 F.2d 1034, 1040 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982).

With respect to the convenience of the parties, Remington would apparently prefer to avoid expending effort now to establish its right to indemnification in the future, particularly because it may be enti-

tled to Liberty Mutual's defense of the underlying actions in the meantime, whereas Liberty Mutual would rather proceed in the hope of establishing no coverage under the policy and thus no duty to defend or indemnify. Because it was Remington which brought suit, and only a miscalculation on Remington's part as to the progress of the underlying actions causes Remington to seek a stay at this time, the scales tip in favor of Liberty Mutual's desire to go forward on the indemnification claims. The same considerations obtain with respect to the fourth factor enumerated in *Terra Nova*, "the availability and convenience of other remedies," as in this case the "other remedy" under consideration is a stay of Remington's indemnification claims.

Going forward with this litigation might serve the "public interest" because Remington would have a better idea of the resources it has available to address violations cited by the CDEP and EPA, perhaps promoting prompt settlement of the underlying actions or expediting the investigation and remediation processes. *Cf. ACandS*, 666 F.2d at 823. On the other hand, the public interest is not advanced to the extent proceeding on the indemnification claims would be a waste of judicial resources, i.e., the CDEP and EPA find no pollution at the sites, or that Remington need not undertake any remedial measures and thus has no need for indemnification. However, based on the record the Court is skeptical of Remington's claim that it will escape liability in the underlying actions. *See* D.I. 49 at 9.

As to Barnum Ave., the study which Remington submitted to the CDEP in January 1989 reveals that sediment samples extracted from an area of one of the three lakes on the property (Pembroke Lakes) contained lead in excess of the maximum concentration allowable under federal regulations. *See* D.I. 43, Ex. F at 3–5. Lead, mercury, zinc, copper, and chromium "were present at the highest levels relative to the detection limits" throughout the sampled sites. *See id.* at 4–1. The study includes a chart of past practices at the site which would have generated the contaminants

found in the samples. *See id.* at 1–4A. With respect to lead, the report specifically states, "Based on knowledge of products formerly manufactured on the site as well as past practices of waste disposal, it is not surprising to find lead in the sediment samples. Additionally, the proximity of Pembroke Lakes to a major highway is a likely contributing factor to observed concentrations of lead." *Id.* at 3–3.

The study suggests that Remington bears at least some responsibility for the contamination of Pembroke Lakes, and presumably Remington understood the study results in precisely the same manner when it filed for declaratory relief seven months later. The question remains what, if anything, the CDEP expects Remington to do about the contamination. Remington, which bears the burden of proof in seeking a stay, has not presented any evidence suggesting it will ultimately avoid having to undertake any remedial measures at Barnum Ave. Thus, the Court is not persuaded that a declaration of Liberty Mutual's duty to indemnify Remington in the event of such liability would be a wasted effort.

Although Remington represents that the EPA-ordered investigation of the Remington Park facility will not be completed until 1993, *see* D.I. 47 at ¶ 5, the Administrative Order [6] mandating the investigation cites twenty-two "Areas of Environmental Concern (AECs)," i.e., "area[s] at which releases of hazardous waste have occurred." See D.I. 55, Ex. F at 3, 9. The AECs were identified in various studies over the last decade, *see id.* at 9–29, and are generally "waste storage areas, firing range target areas, explosive detonation or burning disposal areas, [and] tank areas," *see id.* at 9, all of which are associated with Remington's operations at the facility. The order also lists the hazardous wastes Remington generates at the site. *See id.* at 8. As early as 1980 a study revealed "significant concentrations of lead and mercury in the mud sediments" of a stream ·which runs through the property. *See* D.I. 43, Ex. G at 29, Ex. M at § V. Again, based on the

record before it, the Court concludes that upon completion of Remington's investigation Remington will likely be required to undertake corrective measures to address the concerns expressed in the EPA order.

In addition, Remington seeks defense and indemnification with respect to a state-initiated lawsuit concerning Remington Park. *See* D.I. 1 at ¶ 19. The record indicates that on August 6, 1987, Remington and the CDEP resolved the litigation by entering into a consent order which required Remington to close a surface impoundment at the facility by August 31, 1988, and thereafter monitor groundwater contamination in the area. *See* D.I. 55, Ex. E. The EPA Administrative Order makes reference to the fact that the surface impoundment was indeed closed. *See id.,* Ex. F at 20. The cost of the closure was estimated at over two million dollars. *See id.,* Ex. H at 15–1. Remington offers no particular explanation why Liberty Mutual's duty to indemnify it with respect to costs incurred at Remington Park at the state's behest should be stayed.

Finally, the Court considers whether it should stay Remington's indemnification claims because to go forward would require the Court to make factual findings which are also subject to determination in the underlying actions. Remington claims that among the overlapping issues are (1) whether property of third persons has been damaged, i.e., polluted, (2) when such damage occurred, and (3) when Remington became aware of the damage. *See* Remington's Reply Brief in Support of Motion to Stay, D.I. 60 at 1, 4–5. *Cf. Riehl,* 772 F.2d at 24–25 (factual issues in insurance coverage dispute arising out of environmental liability are (1) when toxic substances brought onto property and by whom, (2) extent of insured's knowledge of toxic waste dumping, (3) whether insured "expected or intended" pollution, and (4) whether third-party claims have been made against insured). Remington argues not only that it does not have enough information to address these factual issues until further investigation reveals the nature

---

**6.** The record does not contain a complete copy of the Administrative Order.

and extent of contamination at Remington Park and Barnum Ave., *see* D.I. 65 at 24–25, but also that to require Remington to do so would prejudice its defense of the underlying actions. *See id.* at 25–27; D.I. 60 at 4–5.

However, Remington completed its investigation of the Barnum Ave. site more than a year and a half ago, *see* D.I. 43, Ex. F, and has the benefit of over a decade of study of the Remington Park site. *See* D.I. 55, Ex. F at 9–29. In addition, there is no indication that the EPA-ordered investigation of pollution at Remington Park will delve into the specifics of when contamination initially occurred or Remington's knowledge thereof. Thus, the Court's attempt to do so in this case will not duplicate efforts in the underlying proceedings.

As to Remington's claim of prejudice, the Court notes that all the cases Remington cites in support of a stay on this basis, including *Terra Nova*, involved situations in which an insurer had sued for declaratory judgment during the pendency of state court litigation against its insured. *See Prudential Property & Casualty Ins. Co. v. Calvo*, 700 F.Supp. 1104, 1104 (S.D.Fla. 1988); *State Farm Fire & Casualty Co. v. Poomaihealani*, 667 F.Supp. 705, 706 (D.Haw.1987); *Allstate Ins. Co. v. Harris*, 445 F.Supp. 847, 848–49 (N.D.Cal.1978); *Morris v. Farmers Ins. Exch.*, 771 P.2d 1206, 1207 (Wyo.1989). Thus, the concerns those courts expressed regarding the unfairness of permitting the insurer to force the insured to litigate issues in a declaratory judgment action which would be resolved in the underlying actions [7] are inapplicable in this case, as it was Remington which initiated declaratory judgment proceedings. While Remington may have miscalculated the progress of the underlying actions, Liberty Mutual should not have to suffer the consequences of Remington's mistake, particularly because Remington is in a better position than Liberty Mutual to advance the underlying proceedings. If Liberty Mutual is satisfied that enough information is available to present its defense, it should have the opportunity to do so.

**B.** *Liberty Mutual's Motion For Joinder Or Leave To File Third Party Complaint*

Liberty Mutual moves for joinder of DuPont and over one hundred of its excess insurance carriers as additional defendants under Rule 19, Fed.R.Civ.P., or for leave to serve those entities as third-party defendants under Rule 14, Fed.R.Civ.P. Each alternative is discussed in turn.

### 1. *Rule 19 Joinder Motion*

 Liberty Mutual's motion for joinder of DuPont and its excess insurers is essentially a motion to dismiss the case, because DuPont and at least some of its excess insurers are, like plaintiff, Delaware citizens; thus, joinder would destroy diversity of citizenship. *See* Remington's Brief in Opposition to Motion for Joinder, D.I. 57 at 7. This Court recently outlined the analytical framework under Rule 19 for purposes of determining whether parties are necessary and indispensable. *See Johnson & Johnson v. Coopervision, Inc.*, 720 F.Supp. 1116 (D.Del.1989). Rule 19 joinder requires a two-step analysis. "First, the Court must determine whether [DuPont and its excess insurers are] 'persons to be joined if feasible' under Rule 19(a). That is, using the more traditional terminology, the Court first decides whether [DuPont and its excess insurers are] so-called 'necessary part[ies].'" *Id.* at 1121 (citing *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 116–18 & n. 12, 88 S.Ct. 733, 741 & n. 12, 19 L.Ed.2d 936 (1968); *Pujol v. Shearson/American Express, Inc.*, 877 F.2d 132, 134 (1st Cir. 1989)).

If DuPont and its excess insurers are necessary parties under Rule 19(a), and their joinder would destroy the Court's jurisdiction, the Court must determine, under Rule 19(b), whether "in equity and good conscience the action should either proceed among the parties before it, or should be dismissed." Rule 19(b), Fed.R.Civ.P. If application of the factors listed in Rule

---

**7.** *See State Farm,* 667 F.Supp. at 707; *Allstate,* 445 F.Supp. at 851–52; *Morris,* 771 P.2d at 1210.

19(b) leads the Court to conclude that it must dismiss the case, the Court has essentially found the absent parties "indispensable." *See Johnson & Johnson*, 720 F.Supp. at 1121. The movant bears the burden of making out a claim of indispensability. *See Brinco Mining Ltd. v. Federal Ins. Co.*, 552 F.Supp. 1233, 1239 (D.D.C. 1982). Under the circumstances in this case, the Court need only complete the first step of the two-part inquiry, under which neither DuPont nor its excess insurers qualify as necessary parties.

DuPont and its excess insurers are persons "to be joined if feasible" under Rule 19(a) if in their absence, "(1) complete relief cannot be accorded the present parties, or (2) the disposition of the action would prejudice, as a practical matter, [the absent parties'] ability to protect their own interests, or (3) any of the present parties would be subject to a substantial risk of multiple or inconsistent obligations." *Johnson & Johnson*, 720 F.Supp. at 1121–22. As a general proposition, courts and commentators agree that additional or excess insurers are not necessary parties to a suit between an insured and its primary or first layer excess insurer. *See, e.g., Continental Casualty Co. v. PPG Indus., Inc.*, No. 86 C 6076, slip op. at 3–4, 1987 WL 6601 (N.D.Ill. Feb. 6, 1987); *Household Mfg., Inc. v. Liberty Mutual Ins. Co.*, No. 85 C 8519, slip op., 1986 WL 4121 (N.D.Ill. March 26, 1986); 18 Couch on Insurance § 74:618 (2d rev. ed. 1983) ("An excess insurer is not a necessary party to a declaratory judgment proceeding brought by the primary insurer.") *Cf. Special Jet Serv., Inc. v. Federal Ins. Co.*, 83 F.R.D. 596, 599 (W.D.Pa.1979) (citing 18 Couch, *supra*, at § 74:505) (" 'The fact that an insurer is concerned with the results of a lawsuit does not mean that it is ... a necessary party therein.' ") In its briefs, Liberty Mutual claims that DuPont and its excess insurers are necessary parties under all three tests set forth in Rule 19(a). The Court will address each category in turn.

*a. Complete Relief for Present Parties*

Liberty Mutual argues that the Court cannot afford Remington complete relief in the absence of DuPont and its excess insurers because coverage under DuPont's insurance program will be "implicated" by the Court's decision in any one of several ways. First, even if the Court finds coverage under the Liberty Mutual policies, Remington's total liability for the underlying claims will probably exhaust such coverage, so Remington will need to seek additional coverage under DuPont's insurance program. *See* Liberty Mutual's Opening Brief in Support of Motion for Joinder, D.I. 42 at 11–12. Alternatively, if the Court finds no coverage under the Liberty Mutual policies, Remington will only have DuPont and its excess insurers to turn to for insurance coverage. *See id.* at 12. In its Reply Brief, Liberty Mutual also mentions the "drop down" and "proration" theories of allocation of liability among insurers as other means by which DuPont and its excess carriers' coverage may be "implicated." *See* Liberty Mutual's Reply Brief on Joinder Motion, D.I. 58 at 5–6.

As an initial matter, and as more fully discussed in Section B.2 *infra*, there is no evidence that Remington can seek insurance coverage from DuPont itself. *See* D.I. 56 at ¶ 4. In addition, regardless of whether their coverage is "implicated," the excess insurers' absence does not prevent the Court from providing Remington the relief it seeks—an interpretation of the terms and conditions of the various Liberty Mutual policies. *See Continental Casualty*, slip op. at 3–4 (excess carrier defendants issued policies separate from those of plaintiff excess carrier and thus were not necessary for plaintiff to be accorded relief as to its own, independent policy); *Special Jet*, 83 F.R.D. at 598 ("The respective obligations of liability insurers must be determined from the construction of language employed by the insurers in their respective policies and complete relief can thus be afforded.") (citations omitted). *Cf.* D.I. 58 at 4 ("[B]efore the proper allocation of insurance coverage becomes an issue, this Court must determine under which insurer's policy any alleged property damage ... has taken place.")

Liberty Mutual also contends that Du-Pont and its excess insurers must be joined because an insured does not have an unfettered right to designate a particular triggered policy for coverage, and liability must be apportioned chronologically and seriatim among triggered policies. *See* D.I. 58 at 3–6. However, the cases cited by Liberty Mutual involved successive primary liability insurers, not, as in this case, insurers providing different layers of coverage. *See ACandS*, 764 F.2d at 970; *Air Prods. & Chems., Inc. v. Hartford Accident & Indem. Co.*, 707 F.Supp. 762, 764–65 (E.D.Pa.1989).

### b. Absent Parties' Ability to Protect Interests

Liberty Mutual contends that if DuPont and its excess insurers are not joined, their ability to protect their interests will be impaired to the extent the Court's interpretation of the trigger of coverage under Liberty Mutual's policies implicates coverage under DuPont's insurance program as outlined *supra* in Section B.1.a. *See* D.I. 42 at 13–14. As to DuPont, its interest in this litigation is identical to Remington's, as both would presumably prefer insurance coverage for the underlying environmental claims over Remington's incurring expenses and liability itself. In addition, Du-Pont is actively protecting its interest by participating in the conduct of this case (*see* D.I. 19 at ¶¶ 7, 8; D.I. 65 at 2). *See White Hall Bldg. Corp. v. Profexray Div. of Litton Indus., Inc.*, 387 F.Supp. 1202, 1207 (E.D.Pa.1974), *aff'd mem.*, 578 F.2d 1377 (3d Cir.1978), and *aff'd mem., Quaglia v. Profexray Div. of Litton Indus., Inc.*, 578 F.2d 1375 (3d Cir.1978) (entity with *de facto* control of litigation is in position to affect its outcome and thus need not be named party for purposes of Rule 19).

As to the excess insurers, in the event Remington or Liberty Mutual subsequently sues them, the excess insurers will not be bound by this Court's interpretation of Liberty Mutual's policies, as they were not

parties to this litigation. *See Casualty Indem. Exch. v. Village of Crete*, 731 F.2d 457, 462 (7th Cir.1984); *Eagle–Picher Indus., Inc. v. Liberty Mutual Ins. Co.*, 682 F.2d 12, 16 n. 1 (1st Cir.1982), *cert. denied, Froude v. Eagle–Picher Indus., Inc.*, 460 U.S. 1028, 103 S.Ct. 1280, 75 L.Ed.2d 500 (1983); *Field v. Volkswagenwerk AG*, 626 F.2d 293, 301 (3d Cir.1980). Although admittedly a later court might be persuaded by a prior interpretation of Liberty Mutual's policies, it would be free to decide otherwise. "[T]he possible effects of the judgment here on such possible future litigation" do not lead the Court to conclude that the excess insurers' interests will be impaired by a judgment in their absence. *See Casualty Indem.*, 731 F.2d at 462.

Liberty Mutual also argues that the excess carriers' ability to protect their interests will be impaired to the extent evidence and witnesses available now are no longer available at the time of some subsequent litigation. *See* D.I. 42 at 14. But disputes concerning excess carriers' liability inevitably arise some time after the underlying actions are underway and the question of primary coverage is resolved, so excess carriers frequently face the prospect of evidence being lost with the passage of time. Suffice it to say that the excess carriers have expressed no interest in joining this litigation to avoid being disadvantaged in some possible future litigation.

### c. Present Parties' Risk of Inconsistent Obligations

Liberty Mutual relies most heavily on the argument that if DuPont and its excess insurers are not joined, Liberty Mutual faces the risk of multiple and inconsistent obligations. Liberty Mutual fears either one of two scenarios. First, if the Court declares Liberty Mutual's liability in this action, Liberty Mutual would subsequently seek to recover from the excess insurers.[8] Because the excess insurers would not be bound by this Court's interpretation of Lib-

---

**8.** As discussed in Section B.2 *infra*, the theory upon which Liberty Mutual could recover from the excess insurers is not clear to the Court.

erty Mutual's policies,[9] a later court might construe the policies in a manner inconsistent with this Court's holding. *See* D.I. 42 at 14–15; D.I. 65 at 7–8. Apparently the concern is that a later court might find the excess insurers have no liability to Liberty Mutual. However, not only might such a result be consistent with this Court's interpretation, but judgments against Liberty Mutual in both actions, regardless of whether they rest on inconsistent policy interpretations, will not impose inconsistent obligations upon Liberty Mutual. "The fact that insurance coverage issues may be decided in one manner and the contribution issue decided in another manner does not mean that defendant[ ] will be subjected to 'inconsistent obligations.' It will only affect the amount of money the defendant[ ] might recover from the absent insurers." *Reading Co. v. Travelers Indem. Co.*, No. 87–2021, slip op. at 11–12, 1988 WL 13242 (E.D.Pa. Feb. 18, 1988); *see also Micheel v. Haralson*, 586 F.Supp. 169, 171 (E.D.Pa. 1983) (citing *Field*, 626 F.2d at 301–02) (Rule 19 not triggered by possibility of judgments inconsistent as matter of logic but rather protects against situations in which there are "two court orders and compliance with one might breach the other").

The second scenario Liberty Mutual contemplates is one in which the Court finds Liberty Mutual need not indemnify Remington in the underlying litigation or is responsible for coverage only up to a certain amount, and Remington then sues its excess insurers. *See* D.I. 65 at 8. Liberty Mutual is apparently concerned that a later court might relieve the excess insurers of liability or reduce their liability by interpreting Liberty Mutual's policies as requiring more coverage than this Court determines. However, Remington could not recover additional amounts from Liberty Mutual because Remington is bound by this Court's determination. In addition, assuming the excess insurers impleaded Liberty Mutual in the subsequent litigation, they could not recover from Liberty Mutual because a determination of their liability would presume that Liberty Mutual paid the amount which would trigger layers above Liberty Mutual's coverage.

Therefore, while there is a possibility that Liberty Mutual may become involved in more than one lawsuit arising out of the factual circumstances of this case, and Liberty Mutual's policies may receive inconsistent interpretations, it will not face multiple or inconsistent obligations as that phrase is understood in the context of Rule 19(a). Once this Court determines Liberty Mutual's liability to Remington, neither Remington nor DuPont's excess carriers will be entitled to ask for more in a later suit by Remington against the excess insurers. *See Household Mfg.*, slip op.[10]

Because the Court finds that DuPont and its excess insurers are not necessary parties to this proceeding under Rule 19(a), it need not consider whether they are indispensable under Rule 19(b). Accordingly, Liberty Mutual's motion for joinder of DuPont and its excess insurers will be denied.

### 2. *Rule 14 Third–Party Complaint*

■ As an alternative to joinder under Rule 19, Liberty Mutual requests leave to file a third-party complaint for declaratory

---

**9.** Speaking of inconsistencies, the Court notes that with respect to subpart (a)(2)(i) of Rule 19 Liberty Mutual states that "trigger of coverage determinations in this action may have an adverse impact on DuPont and its excess insurers in a subsequent action," D.I. 42 at 14, while as to subpart (a)(2)(ii) Liberty Mutual argues that such issues would be subject to relitigation in a subsequent action involving the excess insurers. *See id.*

**10.** Liberty Mutual's brief also addresses the prospect of Remington facing inconsistent "results," i.e., this Court finding no coverage under Liberty Mutual's policies and a later court doing the same with respect to the excess carriers'

policies. *See* D.I. 42 at 15. Clearly the result that no insurer need indemnify Remington does not subject Remington to multiple or inconsistent obligations. Even if this Court decides Liberty Mutual must pay a certain amount and a later court relieves the excess insurers of liability by finding Liberty Mutual should have paid more, leaving Remington in the lurch for the difference, Remington chose to sue only one insurer in this action and presumably understands the risk of doing so. In any event, Remington will not face a situation in which compliance with one court order would cause it to breach another. *See Micheel,* 586 F.Supp. at 171.

relief against DuPont and its excess insurers based on theories of reimbursement, indemnification, contribution, subrogation, quantum meruit, and liability under the "other insurance clauses" of their respective policies. *See* proposed third-party complaint attached to Liberty Mutual's Motion for Joinder, D.I. 35, at ¶ 59. Liberty Mutual's third-party complaint seeks a declaration of the proposed third-party defendants' liability to it in the event the Court finds Liberty Mutual liable to Remington, and a declaration that Liberty Mutual's liability to Remington is "subject to, and limited by, the obligations of" DuPont and its excess insurers to defend and indemnify Remington. *See id.* at 25.

As an initial matter, while Liberty Mutual's request for a determination of the proposed third-party defendants' liability to it is the proper subject of a third party-complaint, Rule 14(a), Fed.R.Civ.P., no longer permits impleader on the theory that the third party defendants are liable to the original plaintiff. *See Feinaugle v. Pittsburgh & Lake Erie R.R. Co.*, 595 F.Supp. 316, 317 (W.D.Pa.1983). To the extent Liberty Mutual's second prayer for relief rests on such a theory, the Court could not entertain it.[11]

"[J]oinder of third-party defendants under Rule 14 is not automatic; rather, the decision to permit joinder rests with the sound discretion of the trial court." *Feinaugle*, 595 F.Supp. at 317; *see also Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 439 (3d Cir.1971), *cert. denied*, 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972) (trial court's decision to deny impleader subject to abuse of discretion standard of review); *Fuel Transp. Co. v. Fireman's Fund Ins. Co.*, 108 F.R.D. 156, 158 (E.D.Pa.1985). In *Somportex*, the Third Circuit stated that "a court, called upon to exercise its discretion as to impleader, must balance the desire to avoid circuity of actions and to obtain consistent results against any prejudice that the plaintiff might suffer from complications of the case." *Somportex*, 453 F.2d at 439 n. 6. Among the factors district courts have considered in determining whether or not to permit impleader are (1) prejudice to the original plaintiff; (2) complication of issues at trial; (3) likelihood of trial delay; and (4) timeliness of the motion to implead. *See O'Mara Enter., Inc. v. Mellon Bank*, 101 F.R.D. 668, 670 (W.D.Pa.1983); *see also Fuel Transp.*, 108 F.R.D. at 158.

As to the first three factors listed *supra*, Remington claims it would be prejudiced by the delay, complication of issues and increased expense which adding over one hundred parties would entail. *See* Remington's Brief in Opposition to Motion for Joinder, D.I. 57 at 16. The Court agrees that permitting impleader would complicate the issues because in addition to deciding whether Liberty Mutual's policies cover the underlying environmental claims, the Court would also have to address whether Liberty Mutual is entitled to indemnification or contribution from Dupont and its excess insurers. However, as Remington itself suggests, *see id.* at 17, severance of Liberty Mutual's third-party claim from the main declaratory judgment action would alleviate any undue complexity in trying the main action, and would also avoid trial delay. Liberty Mutual apparently opposes separate treatment of Remington's claim against Liberty Mutual and Liberty Mutual's third party complaint because the proposed third-party defendants would have "no say in what is going on" in the main action. D.I. 65 at 11.

Remington's concern over increased expense is not insubstantial given the number of parties Liberty Mutual seeks to add. As to the fourth factor, Liberty Mutual's motion was timely in that it was made within the time set by the Court to join additional parties.

In light of Liberty Mutual's insistence that the main and third-party claims pro-

---

**11.** In addition, while Liberty Mutual may implead non-diverse defendants, Remington could not amend its complaint to add direct coverage claims against excess insurers which, like it, are Delaware citizens. *See Owen Equipment &*

*Erection Co. v. Kroger*, 437 U.S. 365, 377, 98 S.Ct. 2396, 2404, 57 L.Ed.2d 274 (1978); *General Refractories Co. v. American Mutual Liability Ins. Co.*, 678 F.Supp. 104, 106 (E.D.Pa.1987).

ceed together, the Court concludes that it must deny Liberty Mutual's motion given the potential prejudice to Remington which impleader would entail. While the Court recognizes "that all parties who might ultimately bear responsibility for the underlying claims [should] be made parties to the action to avoid prejudice to their rights as well as costly, inefficient duplicative litigation," *Rorer Group, Inc. v. Home Indem. Co.*, No. 88–9752, slip op. at 14, 1990 WL 106724 (E.D.Pa. July 25, 1990), the Court suspects that permitting impleader of over one hundred parties, including those excess insurers at the uppermost limits of coverage, *see* D.I. 65 at 12–13, may generate costly, inefficient litigation. For one thing, Remington's liability may never reach the minimum attachment points of its various excess policies. *Cf. New Castle County v. Continental Casualty Co.*, 725 F.Supp. 800, 818 (D.Del.1989), *appeal filed*, No. 89–3814 (3d Cir. Dec. 12, 1989) (claim against excess insurer premature because no showing of exhaustion of underlying primary insurance); *Employers Ins. of Wausau v. McGraw–Edison Co.*, No. K86–48 CA, slip op., 1987 WL 58061 (W.D.Mich. Aug. 8, 1987) (same).

In addition, the Court is skeptical of the alleged bases of DuPont's and its excess insurers' liability to Liberty Mutual. "Unless some theory of liability can be shown, there is no basis for impleader." 3 Moore's Federal Practice ¶ 14.12 at 1469–70; *see also Forum Ins. Co. v. Ranger Ins. Co.*, 711 F.Supp. 909, 915 & n. 21 (N.D.Ill.1989) (impleader denied because no showing that third party defendant could be liable to original defendant for any of plaintiff's claim against defendant); *Feinaugle*, 595 F.Supp. at 318 (same). Liberty Mutual claims that the "other insurance" clauses in its policies establish that DuPont and its excess insurers are potentially liable to Liberty Mutual on the basis of contribution and apportionment. *See* D.I. 42 at 25–26. Liberty Mutual does not explain how DuPont's self-insured retention constitutes other insurance within the meaning of its policy. DuPont never issued insurance to Remington. *See* D.I. 56 at ¶ 4. *Compare Rorer*, slip op. at 8–9 (contract of sale

expressly required parent company to indemnify subsidiary for certain liabilities). As to the excess insurers, Liberty Mutual fails to mention that the referenced "other insurance" clause only appears in Liberty Mutual's primary policies, *see* D.I. 56 at ¶ 6, and thus furnishes no basis for a contribution claim by Liberty Mutual as an excess insurer against DuPont's excess insurers.

In its reply brief, Liberty Mutual apparently argues that the excess insurers are potentially liable to Liberty Mutual by virtue of common law contribution. *See* D.I. 58 at 10–11. Contribution is "[t]he share of loss payable by an insurer when contracts with two or more insurers cover the same loss." Black's Law Dictionary 297 (5th ed. 1979); *see also* A. Windt, *Insurance Claims and Disputes* § 10.01 (1988). As virtually all of the excess carriers' coverage attaches at a point above the limits of Liberty Mutual's policies, they clearly do not insure against the same loss. *See Reading Co.*, slip op. at 11 (defendant-insured could seek contribution from insurers with like liability). *Cf.* 8A J. Appleman, *Insurance Law and Practice* § 4904 (1981) ("If an insurer's policy was only excess insurance, it would not be liable to the primary insurer which was compelled to pay a claim.") As to DuPont, the Court reiterates its previous statement that DuPont is not Remington's insurer.

## CONCLUSION

For the foregoing reasons, the Court will deny Remington's motion to stay two of its indemnification claims and will deny Liberty Mutual's motion for joinder or for leave to file a third-party complaint. An appropriate order will be entered.