**HENKEL CORPORATION**

v.

**DEGREMONT, S.A. and L'Air Liquide.**

**Civ. A. No. 90–6413.**

United States District Court, E.D. Pennsylvania.

April 19, 1991.

Thomas A. Masterson, Morgan, Lewis & Bockius, Philadelphia, Pa., for plaintiff.

J. Clayton Undercofler, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for Degremont.

John G. Harkins, Jr., Pepper, Hamilton & Scheetz, Philadelphia, Pa., for L'Air Liquide.

## MEMORANDUM

O'NEILL, District Judge.

### I. *Introduction.*

Plaintiff Henkel Corporation ("Henkel") brought this action alleging that defendants Degremont, S.A. ("Degremont") and L'Air Liquide ("Air Liquide") breached a joint venture agreement through which Henkel would acquire control over an ozone technology business in North America. Henkel's Complaint alleges breach of contract in Count One, promissory estoppel in Count Two and breach of fiduciary duty in Count Three.

Degremont and Air Liquide have moved to dismiss Henkel's Complaint[1] on the grounds that: (i) Henkel's service of process was insufficient; (ii) this Court lacks personal jurisdiction over Degremont and Air Liquide; (iii) Henkel has failed to join its parent company, Henkel KGaA ("Henkel Germany") as a plaintiff, and Henkel Germany is an indispensable party to this action whose joinder would divest the Court of subject matter jurisdiction; and (iv) venue is improper in this district under the doctrine of *forum non conveniens.* I heard oral argument on the motions.

I conclude that Henkel's service of process was not effective. I will not reach the indispensable party issue and cannot decide on the record as currently developed whether the Court has personal jurisdiction over Degremont and Air Liquide. Because personal jurisdiction questions remain unresolved, I cannot determine whether the action should be dismissed on *forum non conveniens* grounds.

Therefore, I will quash Henkel's service of process. I will permit Henkel to decide whether it wishes to attempt to serve Degremont and Air Liquide by other means or whether the Complaint should be dismissed. Finally, I will deny Henkel's motion for expedited discovery without prejudice to its renewal if hereafter defendants are served properly.

### II. *Facts.*[2]

Henkel is a United States company incorporated in Delaware with its principal place of business in Gulph Mills, Pennsylvania. Henkel is a wholly owned subsidiary corporation of Henkel Germany, a German partnership. Degremont and Air Liquide are French corporations with their principal places of business in France.

In April of 1989, Henkel entered the ozone water treatment business by ac-

---

**1.** Although Degremont and Air Liquide have filed separate motions to dismiss, both assert the same grounds for dismissal and their arguments in support of those grounds are generally parallel. Therefore, I will discuss their contentions jointly and will note those instances in which their contentions or arguments diverge.

**2.** For the purpose of these motions, I have accepted Henkel's allegations of the material facts set forth in its briefs in opposition to defendants' motions but have added thereto some undisputed material facts.

quiring the Emery Group from Quantum Chemicals Corporation. Emery sells a so-called "low frequency" ozone technology for the treatment of waste water and purification of drinking water.

In March of 1990, Henkel decided to acquire a reliable "medium-frequency" ozone technology in order to remain competitive in the water treatment business. Accordingly, Henkel began negotiations in March of 1990 with non-party Asea Brown Boveri Ltd. ("ABB"), a Swiss corporation with its principal place of business in Switzerland, for the acquisition of ABB's medium-frequency ozone technology. ABB's medium-frequency ozone technology has been the most successful commercially in the United States ozone industry. Negotiations between Henkel and ABB progressed through March, April and May of 1990.

During late April or early May of 1990, Dr. Deiter Ambros, who is Chairman of the Board of Henkel and Executive Vice–President of Henkel Germany, received a telephone call from Michael Ulrich of Degremont to discuss a joint venture between Degremont and Henkel Germany for the acquisition and commercial development of the ABB ozone technology.

In discussions leading up to the parties' meeting on May 4, 1990 in Paris, Ulrich told Ambros that if Henkel ceased its then on-going negotiations for the direct acquisition of ABB's ozone technology business and permitted Degremont to acquire the business Degremont would agree to form a joint venture in which Henkel would acquire control over ABB's ozone business in North America. Henkel agreed to meet with Degremont in Paris to discuss the formation of the joint venture.

On May 4, 1990, Olivier Kreiss and Ulrich of Degremont met in Paris with Ambros and Dr. Harald Wulff, Henkel's President and CEO. Also present at the meeting was a representative of Air Liquide, Dominique Belot. Belot and Kreiss advised Ambros and Wulff that Air Liquide was present because it would be a third member of the joint venture.

It is alleged that during the May 4, 1990 meeting, Henkel, Henkel Germany, Degremont and Air Liquide entered into an agreement (the "Joint Venture Agreement") for the formation of the joint venture and the division of ABB's ozone business once it was acquired by Degremont and Air Liquide. Having reached agreement on the essential terms of the joint venture at the meeting, Kreiss, Belot, Ambros and Wulff summarized the terms in a memorandum (the "May 4 memorandum") which they all signed that day.

According to the Joint Venture Agreement, Henkel was to pay one-third of the acquisition price for ABB and Degremont. and Air Liquide were to pay jointly the remaining two-thirds of the acquisition price. In exchange for paying one-third of the acquisition price and contributing its ozone business to the joint venture, Henkel was to receive a 51% interest and management rights in a company (the "U.S. Corporation") which would have the right to exploit ABB's medium-frequency ozone technology in North America.

In exchange for paying their respective shares of the remaining two-thirds of the acquisition price, Degremont's agreement to contribute its ozone business to the joint venture and Air Liquide's agreement to buy equipment for the generation of ozone from the U.S. Corporation, Degremont and Air Liquide were to receive jointly a 90% interest in the Holding Company which would own a 49% interest in the U.S. Corporation. In addition, Air Liquide and its subsidiaries were to have the right to sell and install the plant and equipment which are necessary to generate ozone on-site for customers of the medium-frequency process. Henkel Germany was to receive the remaining 10% of the stock of the Holding Company.

On or about June 25, 1990, Degremont advised Henkel that Degremont and Air Liquide had acquired ABB's worldwide ozone business for approximately 9.5 million Swiss francs. Degremont also informed Henkel that Degremont and Air Liquide were in the process of creating new joint venture companies in Switzerland and France to begin exploiting the medium frequency technology.

The parties met again in Paris on August 28, 1990. Henkel contends that at that meeting, subsequent to the completion of their acquisition of ABB's ozone business, Degremont and Air Liquide informed Henkel that they would exclude Henkel from the joint venture unless they received 60% of the stock of and management right in the U.S. Corporation.

At the close of the August 28, 1990 meeting, Ambros arranged an additional meeting between the parties to take place at Henkel's corporate headquarters in Gulph Mills, Pennsylvania. Henkel Canada, a Canadian subsidiary of Henkel Germany, confirmed the meeting in a letter dated September 24, 1990 to Ulrich of Degremont. The letter describes the purpose of the meeting as follows:

> The meeting is to involve a *mutual* exchange of information such as order backlog, market shares, people and organization, technology, patents, etc. This *mutual* exchange should enable us to determine whether there is indeed some material change since the May 4 meeting. Furthermore, we would like to get from you sufficient information to enable us to determine the value of the proposed Henkel shareholding in Ozonia International.

The letter also states, "we would like Mr. Belot of L'Air Liquide also to attend the meeting."

On October 4, 1990, Henkel filed its Complaint in this action.

On October 5, 1990, the parties met at Henkel's headquarters in Gulph Mills. The meeting lasted over three hours. At the conclusion of the meeting, Henkel caused a process server to serve a summons and complaint on the Degremont and Air Liquide representatives who were present.

On November 23, 1990, Henkel Germany and Henkel entered into an "Assignment and Assumption Agreement". The Assignment and Assumption Agreement states in part as follows:

> NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Henkel Germany and Henkel, intending to be legally bound hereby, agree as follows:
>
> 1. Henkel Germany hereby assigns, transfers, bargains and sets over to Henkel all of its rights, title and interest in and to, and all of its obligations under, the [Joint Venture] Agreement.
>
> 2. Henkel hereby accepts such assignment and agrees to be bound by the terms and provisions of the [Joint Venture] Agreement pertaining to Henkel Germany.
>
> 3. Henkel hereby agrees to defend, indemnify and hold harmless Henkel Germany from and against any and all claims, damages, costs, expenses, liabilities, losses, obligations, or causes of action, including, without limitation, the Action, which arise from the [Joint Venture] Agreement.

The Assignment and Assumption Agreement is signed by representatives of both Henkel Germany and Henkel.

III. *Discussion.*

1. *Degremont and Air Liquide's Motions to Dismiss.*

A. Henkel's Service of Process on Degremont and Air Liquide Was Not Effective and Will be Quashed.

Degremont and Air Liquide have moved to dismiss Henkel's Complaint under Fed. R.Civ.P. Rule 12(b)(5) on the grounds that Henkel's service of process was insufficient. They argue that they were "lured" into this jurisdiction through Henkel's request that the Degremont and Air Liquide representatives attend the October 5, 1990 meeting in Gulph Mills.

The parties agree that "if a person is induced by artifice or fraud to come within the jurisdiction of the court for the purpose of procuring service of process, such fraudulent abuse of the writ will be set aside upon proper showing." *Commercial Mutual Accident Co. v. Davis*, 213 U.S. 245, 256, 29 S.Ct. 445, 448, 53 L.Ed. 782 (1909) (citing *Fitzgerald & Mallory Constr. Co. v. Fitzgerald*, 137 U.S. 98, 11 S.Ct. 36, 34 L.Ed. 608 (1890)). *See also Hotlen v. Middour*, 404 Pa. 351, 171 A.2d 760, 761

(1961) ("[P]ersonal service of process, if procured by fraud, trickery or artifice is not sufficient to give a court jurisdiction over the person thus served, and service will be set aside upon proper application."); 4 Wright & Miller, *Federal Practice and Procedure: Civil 2d* § 1076, at 502 (1987 & 1991 Supp.) ("Immunity from service ... is extended to a party who is induced to come into the jurisdiction by the fraud or deceit of the plaintiff or the plaintiff's attorney in order to be served with process.").[3] The Court of Appeals for the Seventh Circuit has referred to this rule as the "fraudulent enticement doctrine". *See TMF Tool Co. v. Muller*, 913 F.2d 1185, 1190 (7th Cir.1990).[4]

i. *Commercial Mutual Accident Co. v. Davis did not establish a per se rule that service subsequent to good faith settlement negotiations is always proper.*

Relying on *Commercial Mutual, supra,* Henkel contends that its conduct did not amount to fraud, trickery or deceit because the parties made a good faith attempt to settle their dispute immediately prior to service of Henkel's Complaint.

In *Commercial Mutual,* the plaintiff, Mary Davis, commenced suit against the defendant insurance company, Commercial Mutual, in state court in Missouri. Davis sought to recover under a policy which her deceased husband held with Commercial Mutual insuring him against accidental death. Commercial Mutual removed the action to the Circuit Court for the Central Division of Western Missouri. It made no appearance in that court or in the state court except for the purpose of removing the action and challenging the court's jurisdiction.

The Supreme Court's opinion does not reveal the date that Davis filed her Complaint. However, on February 20, 1907, Davis wrote a letter to Commercial Mutual which stated, among other things,

However, if you think it is right you may send some one here to examine the body for you. Can't you also send some one authorized who could settle the claim here if your doctor found everything as reported, as most of the claims have been paid, and I am very anxious to have the balance settled as soon as possible.

Then, too, if I should want to compromise the claim in lieu of an examination, your agent would have power to settle it without any delay. Please let me know just when you will send some one as I am thinking of going to Saint Louis for a few days and would like to be here when he comes, so let me know several days in advance.

*Commercial Mutual,* 213 U.S. at 250–51, 29 S.Ct. at 446.

In response, Commercial Mutual informed Davis that it would send a medical representative to examine the body and that the representative would have the authority to make an adjustment. On February 27, 1907, one Dr. Mason, having received a written letter of authority from Commercial Mutual authorizing him to act on behalf of the company in the examination of the body and to adjust the claim, met with Davis's representative. The Supreme Court described the events which occurred at the meeting:

The testimony is not altogether in harmony as to what occurred at the meeting of February 27. It does appear that the representative of the plaintiff and Dr. Mason met and conferred upon the matter of compromising the claim, and that afterwards an offer was made by the plaintiff's representatives to proceed with an examination of the body of the deceased. Dr. Mason declined this offer until he could have another physician present; and after some negotiation a deputy sheriff appeared and served process upon Dr. Mason as an agent of the company, upon a petition which had been prepared before his arrival, and which

---

3. *See, generally,* "Attack on Personal Service As Having Been Obtained By Fraud Or Trickery", 98 A.L.R.2d 551 (1964 & 1990 Supp.) (collecting cases).

4. In *TMF Tool,* the Court of Appeals for the Seventh Circuit considered a District Court's imposition of sanctions under Fed.R.Civ.P. Rule 11, and did not undertake a substantive discussion of the fraudulent inducement doctrine. *TMF Tool,* 913 F.2d at 1191 & n. 1.

was filed in the case subsequently removed to Federal court.

*Id.,* at 251, 29 S.Ct. at 446.

Commercial Mutual objected to plaintiff's service of process on Dr. Mason in part on the grounds that Dr. Mason was enticed into the jurisdiction by the plaintiff's trick. *Id.,* at 251–252, 29 S.Ct. at 446–447.[5] In rejecting this contention, the Supreme Court deferred to the factual finding of the Circuit Court:

> It is contended by counsel for the plaintiff in error that the evidence is undisputed and clearly demonstrates the fraudulent conduct of the plaintiff in obtaining service in this case. But we are not prepared, on this question of fact, to say that the court below committed plain error. The court might have found upon the testimony that there was a *bona fide* attempt to settle the controversy between the parties, and that it was only when they failed to settle that service of summons was made upon Mason, as the agent of the company. There is testimony tending to show that both parties expected an adjustment of the claim to be made at the meeting, which was held for that purpose. There is testimony from which it might be inferred that there was a *bona fide* offer to permit an examination at that time of the remains of the deceased. *We do not feel authorized to find as against the testimony set forth in the bill of exceptions, and the finding of the court below, that the purpose in writing the letter of February 20, and procuring authority to be conferred upon Dr. Mason to settle the case, and to come into the State of Missouri for that purpose, was a mere fraudulent scheme to obtain service upon the insurance company.*

*Id.,* at 256–57, 29 S.Ct. at 448–49 (emphasis on *"bona fide"* in original; additional emphasis added). Thus, the Supreme Court rested its decision on its conclusion that the Circuit Court could have found that the plaintiff did not fraudulently induce Mason to enter the jurisdiction.

Henkel contends that *Commercial Mutual* is factually analogous to this case. Henkel argues that the affidavit of Harald Wulff establishes that Henkel attempted to engage in good faith negotiations with Degremont and Air Liquide at the October 5 Gulph Mills meeting and that had these discussions succeeded Henkel would not have served defendants and would have withdrawn the action. *See* Henkel Corporation's Answer to the Motion of Defendant L'Air Liquide to Dismiss the Complaint, at 12–13; Henkel Corporation's Answer to the Motion of Defendant Degremont, S.A. to Dismiss the Complaint, at 11–12. Not surprisingly, Air Liquide asserts that the October 5 Gulph Mills meeting did not constitute a good faith effort to resolve the parties' dispute. *See* Memorandum of Defendant L'Air Liquide in Support of Motion to Dismiss, at 10.[6]

I decline to accept Henkel's reading of *Commercial Mutual* because that decision was based on the Court's deferential review of a finding of fact, not a conclusion of law. The *Commercial Mutual* decision was based on the Court's refusal to overturn the Circuit Court's implied finding of

---

**5.** Commercial Mutual also objected to the service on the grounds that Dr. Mason was not a person authorized to receive service on its behalf, that it was not engaged in the transaction of business in Missouri and that the return of service did not disclose a valid service under the laws of the United States or the laws of the State of Missouri. *Commercial Mutual,* 213 U.S., at 251–52, 29 S.Ct. at 446–47. The Supreme Court rejected these arguments. *See id.,* at 252–56, 29 S.Ct. at 446–48.

**6.** Degremont's submissions are unclear as to whether Degremont contends that the parties did not engage in a good faith effort to settle their dispute at the October 5 Gulph Mills meet-

ing. Degremont is unequivocal in its position that Henkel had no intention *prior to* the meeting to engage in good faith negotiations, *see* Degremont's Memorandum of Law in Support of its Motion to Dismiss, at 14, but does not claim that the negotiations which actually ensued were not directed towards an amicable resolution of the controversy. In his affidavit attached to Degremont's motion, Olivier Kreiss, the Managing Director of Degremont, states that "[t]he [October 5] meeting lasted approximately three hours, during which we discussed whether a workable association could be created in the United States. The parties were unsuccessful in reaching an agreement." Kreiss Affidavit, ¶ 11.

fact that there was no inducement. The Court stated that the Circuit Court might have concluded that Davis's invitation to Commercial Mutual was a *bona fide* attempt to settle the case and not an inducement made to accomplish service. However, the Court did not establish a *per se* rule that service is proper in all cases in which a bona fide attempt is made to settle a controversy before service is made. A fraudulent inducement inquiry can only be undertaken through an analysis of all of the facts surrounding service in any particular case.[7]

ii. *Service of process should be quashed when the plaintiff invites the defendant into the jurisdiction for the purpose of settlement negotiations and does not clearly and unequivocally warn the defendant that he may subject himself to service of process while within the jurisdiction.*

Subsequent to *Commercial Mutual,* a number of Courts have considered the totality of the circumstances in determining whether any particular service should be quashed. When service of process is made subsequent to settlement negotiations the Courts have recognized the potential for dispute over whether negotiations were instituted and carried out in good faith prior to service. They have attempted to establish rules to avoid the inevitable "swearing matches about who said what to whom". *Coyne v. Grupo Indus. Trieme, S.A. de C.V.,* 105 F.R.D. 627, 630 (D.D.C.1985).

In *Coyne,* plaintiff Marshall Coyne repeatedly urged defendant Miguel Guajardo to come to Washington, D.C. to settle a breach of contract dispute. On May 10, 1983, plaintiff instructed his lawyers to begin drafting papers for the suit. On May 17, 1983, Guajardo called Coyne to set up a meeting on another matter at Coyne's office on May 25. Coyne's lawyers filed the

lawsuit on May 25, 1983. The lawyers also arranged to have a process server wait outside of Coyne's office beginning at 1:30 p.m. to serve the papers at Coyne's instruction.

Guajardo arrived at Coyne's office for the meeting at approximately 2 p.m. on May 25. After some discussion about the other matter, Coyne handed Guajardo a copy of the previously filed complaint "as a courtesy." Guajardo and Coyne then spent several hours discussing settlement of the newly filed lawsuit, and Coyne directed his lawyers to draft a settlement agreement.

The lawyers arrived with the settlement agreement in the evening on May 25. Guajardo stated that he wanted a notice of dismissal of the lawsuit prepared. At approximately 8:30 p.m. Coyne sent the process server home as it appeared that the matter was about to be settled. Guajardo subsequently stated that he wanted his lawyers to review the settlement agreement. Coyne then had his business manager serve Guajardo with papers for himself and the corporate defendant at about 9 p.m.

Guajardo attacked Coyne's service of process on the grounds that he had been fraudulently induced into entering the jurisdiction. The *Coyne* Court agreed and dismissed the action for ineffective service. The Court noted that the rule that process is invalid where a defendant has been lured into the jurisdiction originated as an equitable defense and is addressed not to the court's power over the defendant but to the court's discretion not to exercise that power. *Id.,* at 629 (citations omitted). The Court stated that courts "will sometimes tolerate artifice used to flush out a defendant who is already in the jurisdiction, but will be much more chary of trickery used to induce a defendant to enter a foreign

---

7. Henkel's reading of *Commercial Mutual* would place an undue burden on the Court. If the only criterion for determining whether service is proper is whether the parties engaged in *bona fide* settlement negotiations, the Court would be required to undertake a lengthy and often complex analysis of whether settlement negotiations are *bona fide.* Moreover, such a rule would inevitably lead to abuses by parties seeking to invoke the Court's jurisdiction who would engage in "sham" settlement negotiations in order to establish the propriety of their service. Instead of encouraging settlements, such a rule might discourage settlements, because wary defendants would refuse to enter the jurisdiction through fear of pretextual settlement negotiations.

jurisdiction especially when such trickery impedes the orderly settlement of disputes before they reach the courts." *Id.* (citations omitted).

The *Coyne* Court recognized that "special considerations for the administration of justice exist where the defendant entered the jurisdiction for settlement talks primarily at the instigation of the plaintiff." *Id.* While acknowledging that service may be valid under *Commercial Mutual* where there was a good faith effort to settle immediately before service, *id.*, the Court confronted the problem which is present in this case, that the party seeking to uphold service will inevitably claim that the negotiations were in good faith while the party seeking to have the service quashed will inevitably assert otherwise. *Id.* The *Coyne* Court noted that under circumstances analogous to the facts of its case, Courts have quashed service.

> Courts have found that a plaintiff's real purpose was to serve the defendant with process, and thus have quashed service, where there were prior arrangements to have a process server at the meeting, *Sunshine Kitchens, Inc. v. Alanthus Corp.*, 65 F.R.D. 4, 5 (S.D.Fla.1974), where the plaintiff's lawyers were preparing the suit at the same time as the plaintiff was urging the defendant to come into the jurisdiction, *Oliver v. Cruson*, 153 F.Supp. 74, 78 (D.Mont.1957), and where the plaintiff failed to clearly warn the defendant before the defendant's journey that settlement talks would be fruitless or that the defendant would be served immediately if such talks failed, *E/M Lubricants, Inc. v. Microfral, S.A.R.L.*, 91 F.R.D. 235, 238 (N.D.Ill.1981); *Commercial Bank & Trust Co. v. District Court*, 605 P.2d 1323, 1326 (Okla.1980).

*Coyne*, 105 F.R.D. at 629–630. The *Coyne* Court distilled from these cases "a strong presumption in favor of quashing service whenever a defendant enters the jurisdiction for settlement talks at plaintiff's invitation *and the plaintiff has not clearly and unequivocally alerted the defendant before the trip that the defendant would be served.*" *Id.*, at 630 (emphasis added).

Two policy reasons supported the *Coyne* Court's presumption. The first reason is that courts should encourage pre-lawsuit settlements. "Defendants who enter foreign jurisdictions to talk settlement should not have to fear being blind-sided by a process server subjecting them to a suit in a possibly adverse forum." *Id.* The second reason is a practical one. The *Coyne* Court noted that

> courts should avoid, if possible, the unpleasant and often impossible task of judging the inevitable swearing matches about who said what to whom. A rule that requires the plaintiff to make it absolutely clear to the defendant that service may be made if he enters the jurisdiction helps to avoid this waste of judicial resources.

*Id.*

Applying its rule, the *Coyne* Court concluded that it need not determine whether Coyne in fact told Guajardo of the filing of the lawsuit. Instead, because there was no dispute that Coyne invited Guajardo into the jurisdiction to talk settlement and did not clearly inform Guajardo that he would be served with process at that time, the Court quashed the service and dismissed the action.

In *K Mart Corp. v. Gen–Star Industries Co.*, 110 F.R.D. 310 (E.D.Mich.1986), the Court followed *Coyne*. The *Gen–Star* Court concluded that,

> [t]he better rule ... is a flat prohibition on service ... unless the plaintiff warns the defendant before he enters the jurisdiction that he may subject himself to process, or else when settlement talks fail the plaintiff must give the defendant an opportunity to leave the jurisdiction before service is made. Such a rule avoids inherently difficult determinations as to who initiated meetings, who relied on statements made by whom, and whether the plaintiff engaged in good faith settlement. Such a bright-line rule promotes good faith settlement, is efficient from a judicial standpoint, and serves to distance the courts from the possibility of trickery.

*Id.*, at 313 (emphasis omitted). The *Gen–Star* Court's recognition that the fraudulent inducement doctrine does not apply if the plaintiff provides the defendant with an opportunity to leave the jurisdiction prior to service is a different way of expressing the rule that a defendant who remains in the jurisdiction voluntarily can be served effectively. In such a case, the defendant's presence in the jurisdiction is no longer a result of the plaintiff's artifice or deception and the fraudulent enticement doctrine does not apply.[8]

*Keane v. McGeady*, 36 F.R.D. 682 (E.D. Pa.1965), which Henkel cites in support of its position, confirms the rule of *Coyne* and *Gen–Star*. In *Keane*, the Court recognized the traditional rule that service of process is invalid if obtained through improper means, *id.*, at 683 (citing *Hotlen, supra*), but declined to quash the service:

> ... [D]efendant was told by plaintiff's father, in the presence of plaintiff, that he might be served with a complaint at some future time when he came to Philadelphia [citation to deposition transcript]. *Thus defendant was on notice, had knowledge of the existence of a com-*

*plaint, and the possible service of the same when he came to Philadelphia.* *Id.*, at 683 (emphasis added). Thus, the Court concluded that the service was valid because the defendant was warned of the possibility of service should he enter the jurisdiction. *Id.*[9]

■ I find the analysis of *Coyne* and *Gen–Star* persuasive. I conclude that service should be quashed whenever a defendant enters a jurisdiction for settlement talks at the plaintiff's suggestion and the plaintiff has not clearly and unequivocally informed the defendant of the possibility of service should the settlement negotiations fail.

■ All of the factors on which Courts have relied in quashing service under the fraudulent inducement doctrine are present in this case. First, as set forth above, it is undisputed that Henkel initiated the October 5 Gulph Mills meeting for the purpose of discussing the status of the joint venture agreement. In its letter of September 4, 1990 to Ulrich of Degremont, Henkel Canada expressly requested that Belot of Air Liquide attend the October 5 Gulph Mills meeting.[10] Thus, it is undisputed that rep-

---

**8.** Henkel relies on *Jaster v. Currie,* 198 U.S. 144, 25 S.Ct. 614, 49 L.Ed. 988 (1905), in support of its position. In *Jaster,* the plaintiff had served a notice of deposition upon Currie, to be taken in Ohio on September 5, 1899, in connection with a separate proceeding. Currie went to Ohio solely for the purpose of attending the deposition. The deposition was taken on September 5, 1899, and Currie then proceeded to his father's house in Ohio. The plaintiff served Currie with process on September 7, 1899 and Currie departed the jurisdiction on September 8, 1899. *Id.*, at 146, 25 S.Ct. at 614–15.

In concluding that the service was proper, the Supreme Court noted that Currie had decided to "linger in Ohio." *Id.*, at 148, 25 S.Ct. at 615. Thus, the Court implicitly suggested what was made explicit in *Gen–Star*, that absent a warning of the possibility of service, the plaintiff must give the defendant an opportunity to leave the jurisdiction before service is made. Currie had three days in which to leave the jurisdiction and failed to do so. He therefore was present in the jurisdiction voluntarily and not as a result of the defendant's fraudulent conduct and could be served properly. Moreover, there was no evidence in *Jaster* that the plaintiff intended to serve Currie at the conclusion of the deposition. To the contrary, the writ was filed and the service effected three days after the event which

Currie claimed induced his entry into the jurisdiction.

**9.** Henkel also cites *Williams Elec. Co., Inc. v. Honeywell, Inc.,* 854 F.2d 389 (11th Cir.1988) (per curiam) in support of its position that service was valid in this case. But *Williams* did not deal with allegedly improper service, but with whether the defendants by traveling to Florida to engage in contract negotiations had subjected themselves to the personal jurisdiction of a Florida Court. *Id.*, at 392–93. The *Williams* defendants did not contend that they were fraudulently induced into the jurisdiction for the purpose of service of process.

Finally, Henkel's reliance on *Tope v. Beal,* 98 F.2d 548 (3d Cir.1938), is misplaced. The *Tope* Court affirmed without discussion the decision of the District Court that the defendant was not fraudulently induced into entering the jurisdiction. Absent a recitation of the facts upon which the District Court based its decision, *Tope* does not control this case. *See, e.g., Gen–Star,* 110 F.R.D. at 313 ("The facts of *Tope* are not developed, so it is impossible to make a comparison with the present situation.").

**10.** The letter states in paragraph 1 that the meeting is scheduled for October 4, 1990 in Gulph Mills. In his affidavit attached to Degremont's

resentatives of Degremont and Air Liquide attended the October 5, 1990 Gulph Mills meeting at Henkel's invitation. *See Coyne,* 105 F.R.D. at 629.

Second, assuming that Henkel intended to negotiate and did negotiate in good faith at the October 5, 1990 meeting, the undisputed facts demonstrate that Henkel had filed its Complaint and was prepared to serve Degremont and Air Liquide at the conclusion of the meeting.[11] Henkel filed its Complaint on October 4, 1990, one day prior to the October 5, 1990 meeting. *See Oliver,* 153 F.Supp. at 78. Henkel had at least one process server at the Gulph Mills premises during the October 5, 1990 meeting and Henkel served the Degremont and Air Liquide representatives immediately subsequent to the conclusion of the meeting. *See Sunshine Kitchens,* 65 F.R.D. at 5.

Third, Henkel does not contend that it at any time "clearly and unequivocally" warned Degremont and Air Liquide that were their representatives to attend the meeting they could be served with process. Henkel's sole assertion on this issue is that Degremont and Air Liquide had "previously been advised by Henkel that their refusal to honor the Agreement might result in legal action against them in the United States...."[12] *See* Henkel Corporation's Answer to the Motion of Defendant L'Air Liquide to Dismiss the Complaint, at 13; Henkel Corporation's Answer to the Motion of Defendant Degremont, S.A. to Dismiss the Complaint, at 13. In my view, this statement is not a clear and unequivocal warning of the possibility of service of

process. *See Coyne,* 105 F.R.D. at 630; *E/M Lubricants,* 91 F.R.D. at 238. It is also undisputed that Henkel did not inform defendants that it had filed suit one day prior to the October 5 meeting.

Given all of these circumstances, I conclude that service should be quashed. Henkel filed its Complaint and was prepared to serve process prior to the October 5, 1990 meeting. Henkel initiated the meeting, required the presence of an Air Liquide representative at the meeting and at no time informed Degremont or Air Liquide that their representatives might be served with process if they entered the jurisdiction for the meeting. I conclude that under *Coyne* and *Gen–Star,* Henkel's service of process was not effective.

iii. *The most appropriate remedy is to permit Henkel to determine whether it wishes to attempt to serve Degremont and Air Liquide by other means or to have the Complaint dismissed.*

■ Degremont and Air Liquide argue that if Henkel's service of process was not effective I should dismiss Henkel's Complaint. Although Degremont and Air Liquide have moved to dismiss the Complaint, the parties agree that I have discretion to determine whether Henkel should be permitted an additional opportunity to effect service or whether the Complaint should be dismissed. *See* 5A *Federal Practice & Procedure* § 1354, at 288 ("The courts have broad discretion to dismiss the action or to retain the case but quash the service that has been made on defendant.").[13]

motion to dismiss, Kreiss states that the meeting was rescheduled to October 5, 1990 at his request. *See* Kreiss affidavit, at ¶ 11.

**11.** At oral argument Henkel's counsel did not dispute that Henkel was prepared to serve Degremont and Air Liquide at the October 5, 1990 meeting. *See* Transcript of February 8, 1991 hearing, at 64–68.

**12.** Henkel's position is based upon Szoke's affidavit in which he states that at the August 28 meeting, he "told the representatives of Degremont and Air Liquide that, if they did not honor the Agreement, Henkel might have no choice but to take legal action against their companies in order to protect its rights to the ABB medium

range ozone technology, and that Henkel would certainly consider bringing such an action in a United States court." Szoke affidavit, ¶ 7.

**13.** Wright and Miller note that there is not a substantial difference between dismissal for improper service and quashing service. In the case of a dismissal, plaintiff merely reinstitutes the action and has process served again, making sure that the earlier defect in the summons or the mode of service has been corrected. When service is quashed, only the service need be repeated. *See* 5A *Federal Practice & Procedure* § 1354, at 288.

"Service generally will be quashed and the action preserved in those cases in which there is a reasonable prospect that plaintiff ultimately will be able to serve defendant properly." *Id.*, at 289. In this case, on the present record, I cannot determine whether Henkel will be able to serve properly Degremont and Air Liquide. Therefore, I will quash Henkel's service of process and will give Henkel the option of either attempting to serve Degremont and Air Liquide properly or of having me dismiss the Complaint for insufficient service under Rule 12(b)(5).

### B. Rule 19 Indispensable Party.

■ Alternatively, Degremont and Air Liquide have moved to dismiss Henkel's complaint under Fed.R.Civ.P. Rule 12(b)(7) and Fed.R.Civ.P. Rule 19. Degremont and Air Liquide contend that Henkel Germany is a necessary party whose presence is indispensable in this action. They argue

that since they are citizens of France and Henkel Germany is a citizen of Germany, Henkel Germany's presence in the action would destroy the requirement of complete diversity.[14] Because I have determined that Henkel's service of process was defective, I decline to reach this issue.[15]

### C. Personal Jurisdiction.

The parties agree that the issue whether Degremont and Air Liquide are subject to the personal jurisdiction of this Court is not ripe because Henkel seeks discovery on the issue. Therefore I cannot decide the issue at this time.

### D. Forum Non Conveniens.

■ I cannot decide defendants' *forum non conveniens* motion because I have not determined whether this Court has jurisdiction over the parties. In *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 504, 67 S.Ct. 839,

---

**14.** Perhaps the difference is only semantic but I would phrase this contention another way. This Court has no jurisdiction of a suit between aliens. *See* 14 *Federal Practice & Procedure* § 3661, at 373–374. Accordingly, Henkel Germany could not be added as a plaintiff.

**15.** I note that the Rule 19 analysis in this case is complicated by the purported assignment by Henkel Germany of its rights under the Joint Venture Agreement to Henkel U.S. Rule 19 provides a two-part test for determining whether an action should be dismissed for failure to join an indispensable party. *See Johnson & Johnson v. Coopervision, Inc.*, 720 F.Supp. 1116, 1121 (D.Del.1989) (collecting cases). First, I must determine whether Henkel Germany is a "person to be joined if feasible" under Rule 19(a). That is, using more traditional terminology, whether Henkel Germany is a "necessary party". *Id.* (collecting cases). If Henkel Germany is a necessary party, I must next determine whether under Rule 19(b), "in equity and good conscience the action should proceed among the parties before [the Court], or [alternatively, whether the action] should be dismissed." Fed. R.Civ.P. Rule 19(b).

I note that the Rule 19 analysis does not present an issue of subject matter jurisdiction. *See* 7 *Federal Practice and Procedure* § 1611, pp. 171–174 & nn. 18–25 (collecting commentary and cases); *Mallow v. Hinde*, 25 U.S. (12 Wheat.) 193, 198, 6 L.Ed. 599 (1827). "[I]t is important to recognize that the court does have jurisdiction both over the parties properly be-

fore it and the subject matter of the action, even though the indispensable party cannot be joined. The decision by the court not to proceed is based upon equitable considerations alone." 7 *Federal Practice and Procedure* § 1611, pp. 174–175 (footnotes omitted).

In this case, Degremont and Air Liquide argued in their motions to dismiss that because Henkel Germany was a party to and retained a 10% interest in the Joint Venture Agreement, Henkel Germany was a necessary party. Degremont and Air Liquide further argued that analysis of the factors set forth in Rule 19(b) required dismissal of the action.

Henkel now contends that Henkel Germany's assignment of all of its rights and obligations under the Joint Venture Agreement to Henkel compels the conclusion that it is not a necessary party under Rule 19(a). Degremont and Air Liquide contend that the assignment is not dispositive because a number of Courts have held that parents of wholly owned subsidiaries are always necessary parties under Rule 19. In the alternative, both Degremont and Air Liquide have challenged the validity of the assignment. Resolution of the question whether the assignment is valid will in my view require a determination of whether the law of Pennsylvania, Germany or France will apply to this question and a subsequent application of that law to Henkel Germany's purported assignment. In light of the fact that Henkel must decide whether it intends to effect service on Degremont and Air Liquide through other means or have its Complaint dismissed, I decline to undertake this analysis at this time.

84, 91 L.Ed. 1055 (1947), the United States Supreme Court stated that "... the doctrine of *forum non conveniens* can never apply if there is absence of jurisdiction ..." *See also* 15 *Federal Practice & Procedure* § 3828, at 287; *Driscoll v. New Orleans Steamboat Co.*, 633 F.2d 1158, 1159 & n. 1 (5th Cir.1981).[16]

### 2. *Henkel's Motion for Expedited Discovery.*

Because I have concluded that Henkel's service of process in this action should be quashed, I will deny Henkel's motion for expedited discovery without prejudice to its renewal at such time as Henkel demonstrates that Degremont and Air Liquide have been effectively served.

### IV. *Conclusion.*

For the foregoing reasons, I will quash Henkel's service of process. I will give Henkel the option of determining whether it wishes to effect service through some other means or whether it wishes me to dismiss the action. I decline to address defendants' Rule 19 indispensable party motions. Because discovery is incomplete, I cannot decide defendants' motions to dismiss for lack of personal jurisdiction or their motions to dismiss on *forum non conveniens* grounds. Finally, I will deny Henkel's motion for expedited discovery without prejudice to its renewal if service upon defendants is effected hereafter.

---

**16.** Although I cannot reach the defendants' *forum non conveniens* arguments at this time, I do express doubt as to whether this is the proper forum for this action. In *Lony v. E.I. Du Pont de Nemours & Co.*, 886 F.2d 628 (3d Cir.1989), the Court of Appeals for the Third Circuit reviewed the *forum non conveniens* doctrine. Under the doctrine, a district court may, in the exercise of its sound discretion, dismiss a case when an alternative forum has jurisdiction to hear the case, and when trial in the chosen forum would establish oppressiveness and vexation to a defendant out of all proportion to the plaintiff's convenience. *Id.*, at 632 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241, 102 S.Ct. 252, 258, 70 L.Ed.2d 419 (1981)). In deciding whether to dismiss a case for *forum non conveniens*, "the ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice." *Lony*, 886 F.2d at 632 (quoting *Koster v. American Lumbermens Casualty Co.*, 330 U.S. 518, 524, 67 S.Ct. 828, 831–32, 91 L.Ed. 1067 (1947)). However, the plaintiff's choice of forum should rarely be disturbed, unless the balance of factors is strongly in favor of the defendant. *Lony*, 886 F.2d at 632 (quoting *Lacey v. Cessna Aircraft Co.*, 862 F.2d 38, 43 (3d Cir.1988)). The defendant bears the burden of proof as to all elements of the *forum non conveniens* analysis. *Lony*, 886 F.2d at 632 (citing *Lacey*, 862 F.2d at 43).

The *Lony* Court restated the task of the Court in addressing a *forum non conveniens* analysis:

A district court entertaining a *forum non conveniens* motion must first decide whether an adequate alternative forum exists to hear the case. Furthermore, the court should also consider that a foreign plaintiff's choice of an American forum is entitled to less deference that an American citizen's choice of his home forum. If there is an adequate alternative forum, the district court must consider and balance several private and public interest factors that are relevant to the *forum non conveniens* determination.

*Lony*, 886 F.2d at 633 (quoting *Lacey*, 862 F.2d at 43 (citations omitted) (footnote omitted)).

The parties dispute whether France is an adequate alternative forum for this case and whether the public and private interest factors balance in favor of dismissing the action. Although I do not decide these issues, I lean to the view that France is an adequate alternative forum and that the public and private interest factors weigh heavily in favor of dismissal. The private interest factors weigh in favor of France in part because many of the sources of proof are located in France and many of the witnesses are domiciled in France or Germany. The public interest factors weigh in favor of France in part because of the probability that French law will govern the question whether the events of May 4, 1990, which occurred in Paris, gave rise to an enforceable agreement.